709 F.2d 815
 113 L.R.R.M. (BNA) 2868, 113 L.R.R.M. (BNA) 3311,
97 Lab.Cas. P 10,232,
4 Employee Benefits Ca 1947
 HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL
UNION LOCAL 54; and Frank Gerace, President Hotel
and Restaurant Employees and Bartenders
International Union Local 54
and
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen & Helpers of America, Local 331, Intervenor
v.
Martin DANZIGER, Acting Chairman; Donald Thomas,
Commissioner; Madeline McWhinney, Commissioner; Carl
Zeitz, Commissioner, Constituting the Casino Control
Commission, State of New Jersey; G. Michael Brown, Director
Department of Law and Public Safety, Division of Gaming
Enforcement, State of New Jersey; Department of Law and
Public Safety, Division of Gaming Enforcement, State of New
Jersey; and Thomas Kean, Governor, State of New Jersey
Appeal of HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS
INTERNATIONAL UNION LOCAL 54 and Frank Gerace,
President, Hotel and Restaurant
Employees and Bartenders
International Union
Local 54.
Appeal of The CASINO CONTROL COMMISSION.
Appeal of G. Michael BROWN, Director, Dept. of Law and
Public Safety, Division of Gaming Enforcement;
and Thomas Kean, Governor.
 Nos. 82-5210, 82-5234 and 82-5260.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 15, 1982.
Decided June 6, 1983.
 
 Bernard N. Katz (argued), Michael N. Katz, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for Hotel and Restaurant Employees and Bartender Intern. Union Local 54, et al.
 Irwin I. Kimmelman, Atty. Gen., State of N.J., Anthony J. Parrillo, Asst. Atty. Gen. (argued), Gary A. Ehrlich, Deputy Atty. Gen., Dept. of Law & Public Safety, Div. of Gaming Enforcement, Trenton, N.J., for New Jersey Dept. of Law and Public Safety, Div. of Gaming Enforcement.
 Robert J. Genatt, Gen. Counsel, Thomas N. Auriemma, Deputy Director/Legal Div., John R. Zimmerman, Senior Asst. Counsel (argued), Thomas O'Neill, Asst. Counsel, Ted M. Rosenberg, Asst. Counsel, N.J. Casino Control Com'n, et al., Trenton, N.J., for New Jersey Casino Control Com'n, et al.
 Before GIBBONS, HIGGINBOTHAM and BECKER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judges:
 
 
 1
 Hotel and Restaurant Employees and Bartenders International Union No. 54 (the Union) and its president, Frank Gerace appeal from an order of the district court denying their motion for a preliminary injunction against enforcement of certain provisions of the New Jersey Casino Control Act, N.J.Stat.Ann. 5:12-1 to -152 (West Supp.1982).[1] The defendants are members of the New Jersey Casino Control Commission (the Commission) and officials of the New Jersey Department of Law and Public Safety, Division of Gaming Enforcement (the Division.) The Commission and the Division cross-appeal from the denial of their motions to dismiss the complaint. We hold that we lack appellate jurisdiction over the cross-appeals. With respect to the Union's appeal we vacate the denial of the motion for a preliminary injunction and remand for further proceedings consistent with this opinion.
 
 I.
 
 2
 Parties and Proceedings in the District Court
 
 
 3
 The Union is an unincorporated labor organization within the meaning of section 2(5) of the National Labor Relations Act, (NLRA) as amended. 29 U.S.C. Sec. 152 (1976). It has approximately 12,000 members of whom over 8,000 are employed as waiters, waitresses, bartenders, cooks, kitchen help, housekeepers and other hotel service employees in those establishments in Atlantic City, New Jersey, licensed to operate gambling casinos. The Union has been duly certified by the National Labor Relations Board (the Board), pursuant to section 9 of the NLRA, 29 U.S.C. Sec. 159 (1973), as the representative of those employees for purposes of collective bargaining. It is similarly certified for employees of other businesses in southern New Jersey which do not hold gambling casino licenses. The Union participates on behalf of its members in the Hotel and Restaurant Employees and Bartenders International Union Pension Fund, and its Health and Welfare Fund. Both of these funds are employee benefit plans within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), as amended. 29 U.S.C. Secs. 1001-1381 (1976). President Frank Gerace is a trustee of those funds.
 
 
 4
 In 1977 the New Jersey Legislature passed the Casino Control Act (the Act), which authorizes the licensing of hotels in Atlantic City for casino gambling. That act establishes a Casino Control Commission with broad regulatory authority over casinos and related industries. N.J.Stat.Ann. 5:12-63 to -75 (West Supp.1982) It also establishes in the Department of Law and Public Safety, which the Attorney General heads, a Division of Gaming Enforcement, charged with responsibility for investigating all applicants for licenses, certificates, or permits, and prosecuting before the Commission or in the state criminal courts all proceedings for violation of the Act or regulations promulgated under it. N.J.Stat.Ann. 5:12-76 to -79 (West Supp.1982). The Act requires licensing not only of casinos, but of casino key employees (supervisors), N.J.Stat.Ann. 5:12-89 (West Supp.1982), and of casino employees. N.J.Stat.Ann. 5:12-90 (West Supp.1982). Casino hotel employees include those performing "service or custodial duties not directly related to operations of the casino, including, without limitations, bartenders, waiters, waitresses, maintenance personnel, kitchen staff, but whose employment duties do not require or authorize access to the casino." N.J.Stat.Ann. 5:12-8 (West Supp.1982). For casino hotel employees the Act requires registration. N.J.Stat.Ann. 5:12-91 (West Supp.1982). Section 86 of the Act lists criteria for the disqualification of casino licensees, and the section dealing with registration of casino hotel employees authorizes the Commission to revoke, suspend, limit or otherwise restrict the registration of any such employee who would be disqualified for a license. N.J.Stat.Ann. 5:12-86, -91(b) (West Supp.1982). All industries offering goods or services to the casinos must also be licensed and are subject to the disqualification criteria of section 86. N.J.Stat.Ann. 5:12-92 (West Supp.1982).
 
 
 5
 Particularly relevant to this case is the provision in section 93 of the Act, requiring that every labor organization seeking to represent employees licensed or registered under the Act and employed at a casino hotel register with the Commission annually. N.J.Stat.Ann. 5:12-93(a) (West Supp.1982). Section 93 also provides:
 
 
 6
 No labor organization, union or affiliate registered or required to be registered pursuant to this section and representing or seeking to represent employees licensed or registered under this act may receive any dues from any employee licensed or registered under this act and employed by a casino licensee or its agent, or administer any pension or welfare funds, if any officer, agent, or principal employee of the labor organization, union or affiliate is disqualified in accordance with the criteria contained in section 86 of this act. The commission may for the purposes of this subsection waive any disqualification criterion consistent with the public policy of this act and upon a finding that the interests of justice so require.
 
 
 7
 N.J.Stat.Ann. 5:12-93(b) (West Supp.1982). Thus section 93 cross-references to the disqualification criteria in section 86. The criteria include convictions of a list of designated offenses or "any other offense which indicates that licensure of the applicant would be inimical to the policy of this act and to casino operations." N.J.Stat.Ann. 5:12-86(c)(4) (West Supp.1982). They also include:
 
 
 8
 The identification of the applicant or any person who is required to be qualified under this act as a condition of a casino license as a career offender or a member of a career offender cartel or an associate of a career offender or career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of this act and to gaming operations. For purposes of this section, career offender shall be defined as any person whose behavior is pursued in an occupational manner or context for the purpose of economic gain, utilizing such methods as are deemed criminal violations of the public policy of this State. A career offender cartel shall be defined as any group of persons who operate together as career offenders.
 
 
 9
 N.J.Stat.Ann. 5:12-86(f) (West Supp.1982). A union may be disqualified under section 93, therefore, if an officer, agent or principal employee is an "associate of any person whose behavior is pursued in an occupational manner or context for the purpose of economic gain, utilizing such methods as are deemed criminal violations of the public policy of [New Jersey]."
 
 
 10
 In 1978 the Union filed with the Commission the annual registration statement required by section 93(a). Thereafter the Division of Gaming Enforcement conducted an investigation, and reported to the Commission that in its view Frank Gerace, President, Robert Lumino, Secretary-Treasurer, and Frank Materio, Grievance Manager, were disqualified under the criteria of section 86. The Division requested the Commission to prevent the Union from collecting dues from or administering pension or welfare funds on behalf of employees in the casino hotels. The Commission determined to hold a hearing on the Division's report. At a prehearing conference on June 1, 1981 counsel for the Union raised objections to the constitutionality of sections 86 and 93. The Commission requested briefing on the question of its authority to rule upon such objections, and on August 5, 1981 it ruled that since it was not a court it lacked competence to consider them. The Commission then fixed September 9, 1981 as the date for commencement of an evidentiary hearing on disqualification. Counsel for the Union advised the Commission of his client's intention to file a challenge to the constitutionality of sections 86 and 93 in the federal court before that date.
 
 
 11
 On August 17, 1981 the Union and Mr. Gerace filed a verified complaint. The complaint alleged that the Division was seeking to have the Commission impose the sanctions set forth in section 93(b) of the Act, but that section 93 was an attempt to regulate areas which are preempted by the NLRA and by ERISA. It alleged, further, that section 93 impermissibly interferes with federally guaranteed rights of employees of the casino and casino hotel industries with respect to the selection of their exclusive collective bargaining agent. An amended complaint alleged that sections 93 and 86 are preempted by the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), as amended. 29 U.S.C. Secs. 401-531 (1976). The complaint also alleged that section 86(f) is both unconstitutionally overbroad and unconstitutionally vague and thus violates the first, fifth and fourteenth amendments of the Constitution. The plaintiffs sought a declaratory judgment that both sections are void, as well as temporary and permanent injunctive relief against the enforcement of section 93. Plaintiffs also filed a motion seeking preliminary injunctive relief, supported by an affidavit alleging that it would be irreparably injured by being forced to participate in proceedings in violation of section 7 of the NLRA.
 
 
 12
 The Commission acceded to a request by the district court that it defer commencement of its disqualification hearing until the motion for a preliminary injunction was decided. On December 1, 1981 a hearing was held on that motion. At the hearing the Union presented affidavits together with supporting exhibits which were accepted in evidence as uncontroverted by the Commission or the Division. Defendants also placed certain exhibits in evidence. Thereafter both the Commission and the Division moved to dismiss the complaint "on the ground of abstention." On March 22, 1982 the district court considered both motions in an opinion containing findings of fact and conclusions of law. The court's findings of fact are quoted in the margin.[2]
 
 
 13
 In support of their motions to dismiss, the Commission and the Division relied upon Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Although their motions sought an outright dismissal of the complaint, they also relied on Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The district court stated that neither the Younger nor the Burford doctrines applied and that the nature of the Union's challenges to sections 93 and 86 precluded Pullman abstention. No order was entered denying the defendants' motions.
 
 
 14
 In ruling on the motion for a preliminary injunction the district court opined that the plaintiffs were not likely to succeed on the merits of their claim that section 93 of the Act is preempted by the LMRDA. The court had more difficulty with the contentions that the NLRA and ERISA were preemptive, but concluded that because of the discretion vested in the Commission by virtue of the last sentence in section 93(b), in actual application no conflict might arise between that section and those federal statutes.[3] The court was also skeptical of the merits of the Union's contentions that section 86, incorporated by reference in section 93, was unconstitutionally overbroad or unduly vague. Summarizing, the court concluded:
 
 
 15
 In view of all of these considerations, the court concludes that plaintiffs are not likely to succeed on the merits of their vagueness claim. Nor are they likely to succeed on the merits of their related overbreadth and First Amendment claims. The absence of any irreparable harm pendente lite has already been discussed in connection with the discussion of plaintiffs' preemption claims, as has the conclusion that the balance of equities and the public interest weigh against the issuance of a preliminary injunction.
 
 
 16
 536 F.Supp. at 338. An order was entered on March 22, 1982 denying the motion for a preliminary injunction. The plaintiffs appealed. Their application, pursuant to Fed.R.App.P. 8(a) for an injunction pending appeal was initially denied in the district court, and here.
 
 
 17
 Because no preliminary injunction was entered, the Commission went forward with a disqualification hearing. Its subsequent actions were called to the attention of the district court in a motion, pursuant to Fed.R.Civ.P. 62(c), for reconsideration of the issuance of an injunction pending this appeal. On September 28, 1982 the Commission issued an opinion in which it found that President Frank Gerace, Executive Board member Frank Materio and Business Agent Karlos LaSane were disqualified under the criteria of section 86. Gerace and Materio were held to be disqualified under section 86(f) because they were associated with members of organized crime in a manner inimical to the policy of the Act and to gaming operations. LaSane was disqualified under section 86(c) because he had been convicted in 1973 of extortion from persons doing business with Atlantic City while he was a City Commissioner. The Commission concluded that the Union should be barred from collecting dues from its members employed in the casino industry. The district court ordered that the Commission be enjoined, pending this appeal, from taking any steps to enforce section 93 or its September 28, 1982 decision. That order did not prohibit the Commission from rendering an opinion interpreting section 93(b) with respect to the Union's administration of pension and welfare funds. On October 12, 1982 the Commission issued an opinion holding that the dues collection prohibition and the welfare fund prohibition could be applied singly or jointly, but that in this instance it would not invoke the latter sanction.[4]
 
 
 18
 The present status of the case, therefore, is that the district court denied a preliminary injunction against enforcement of section 93 and denied a Rule 8(a) motion for such an injunction pending appeal, but on a Rule 60(b) motion reconsidered the Rule 8(a) motion and granted an injunction pending appeal, which will expire by its terms upon the entry of a judgment disposing of the Union's appeal. Except for that injunction, the Union would now be prohibited from collecting dues from its casino hotel members unless it replaced its President, its Business Agent, and a member of its Executive Board.
 
 II.
 The Cross-Appeals
 
 19
 Neither the Commission nor the Division contends that the denial of a Rule 12(b)(6) motion is anything but an interlocutory order. Both contend, however, that they can appeal by virtue of 28 U.S.C. Sec. 1292(a)(1). Their theory is that "[a]n appeal from an injunctive order supports review of an order denying a motion to dismiss for failure to state a cause of action, for improper venue, for lack of jurisdiction, and for lack of standing." 9 Moore's Federal Practice Sec. 110.25, at 271 (2d ed. 1970) (footnotes omitted). There are several difficulties with applying that theory in this case. In the first place, the Commission and the Division are the prevailing parties in the district court. They simply are not aggrieved by the denial of the preliminary injunction. Moreover no order has been entered on the motions to dismiss. The trial court's opinion discussed these motions, but appeals do not ordinarily lie from opinions. See Fed.R.Civ.P. 54(a), 58. Finally, even if we were to treat the opinion as if it were an order, in this circuit it would not be reviewable in conjunction with an appeal from even the grant of a preliminary injunction. Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir.1982). Thus the Union's contention that the cross-appeals should be dismissed must prevail. Neither section 1291 nor section 1292(a)(1) provides for appellate jurisdiction over them, and they must be dismissed.
 
 
 20
 We can, of course, consider the contention that the district court should have dismissed the complaint on the authority of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), as an alternative ground for affirmance of the denial of preliminary injunctive relief. See New Jersey Education Association v. Burke, 579 F.2d 764, 766 (3d Cir.), cert. denied, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978). Thus no significant prejudice to the state's interests occurs in this instance from its inability to appeal at this time from the trial court's inaction on its motion to dismiss.
 
 III.
 New Jersey Regulation of Gambling
 
 21
 Prior to 1844 New Jersey, like many states, was so tolerant of gambling that it regularly authorized lotteries as a means of raising revenues for public or charitable purposes.[5] The Constitution adopted that year, however, included the provision that "[n]o lottery shall be authorized by this state; and no ticket in any lottery not authorized by a law of this state shall be bought or sold within the state...." N.J. Const. of 1844, art. 4, Sec. 7, p 2. That provision was amended in 1897 to read:
 
 
 22
 No lottery shall be authorized by the legislature or otherwise within this state, and no ticket in any lottery shall be bought or sold within this state, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this state, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished.
 
 
 23
 From 1897 to 1939 the flat prohibition against legalizing any form of gambling was the constitutional public policy of the state. In 1939, however, New Jersey, looking covetously at the potential state revenue which might be derived from pari-mutuel betting, amended art. 4, Sec. 7, p 2 so as to make it lawful "to hold, carry on, and operate in this State race meetings whereat the trotting, running or steeplechase racing of horses only may be conducted between the hours of sunrise and sunset on week days only and in duly legalized race tracks, at which the pari-mutuel system of betting shall be permitted." 1939 N.J.Laws at 1063. The 1939 amendment put the state in the position of having an interest in gambling revenues for the first time since prior to 1844.
 
 
 24
 When the Constitution of 1947 was adopted it included the general provision that "[n]o gambling of any kind shall be authorized by the Legislature unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by a majority of the votes cast by the people at a special election or shall hereafter be submitted to, and authorized by a majority of the votes cast thereon by the legally qualified voters of the State voting at a general election...." N.J. Const. of 1947, art. 4, Sec. 7, p 2. An exception authorized bona fide veterans, charitable, educational, religious or fraternal organizations, civic or service clubs, volunteer fire companies and first-aid or rescue squads to conduct bingo or lotto games and to hold raffles. Thus the pre-1844 practice of supporting worthwhile social activities by gambling revenue was substantially restored. In 1969 art. 4, Sec. 7, p 2 was amended to authorize the conduct of State lotteries "when the entire net proceeds of any such lottery shall be for State institutions, [sic] State aid for education." For the statutory enactments pursuant to this authorization, see N.J.Stat.Ann. 5:9-1 to -25 (West 1973). Other forms of gambling still required approval in a statewide referendum. The voters were generally unreceptive.
 
 
 25
 In 1976, however, the Constitution was amended once more, permitting the Legislature to authorize by law the establishment of gambling houses or casinos in the City of Atlantic City, so long as the authorizing legislation "shall provide [that] the State revenues derived therefrom ... be applied solely for the purpose of providing reductions in property taxes, rentals, telephone, gas, electric, and municipal utilities charges of, eligible senior citizens and disabled residents, in accordance with such formulae as the Legislature may by law provide." N.J. Const. of 1947, art. 4, Sec. 7, p 2.D. Pursuant to that authorization the Legislature adopted the statute containing sections 93 and 86.
 
 
 26
 Unlike the State Lottery Law, N.J.Stat.Ann. 5:9-1 to -25 (West 1973 & Supp.1982), under which the Department of the Treasury is directly in the lottery business, the Casino Control Act authorizes erection of casinos by private investors. The State, however, has a direct financial stake in their operation, since it imposes an annual tax of 8% of gross revenues. N.J.Stat.Ann. 5:12-144 (West Supp.1982). Moreover the statute regulates the hours of casino operation, N.J.Stat.Ann. 5:12-97(a) (West Supp.1982), and contains detailed provisions encouraging reinvestment of casino profits in the expansion of the industry. N.J.Stat.Ann. 5:12-146, -147 (West Supp.1982). Regulation of the industry is financed by license and registration fees. N.J.Stat.Ann. 5:12-139 to -143 (West Supp.1982). Since the casino hotels are privately owned and managed, the State obviously does not claim that they are exempt under section 2(2) of the NLRA, 29 U.S.C. Sec. 152(2) (1976). Nevertheless the state's interests and those of the employers here involved are closely aligned economically.
 
 IV.
 
 27
 Federal Regulation of Collective Bargaining
 
 
 28
 Under the regime of Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908), state law interference with efforts of employees to choose their own collective bargaining representatives was largely beyond the reach of congressional enactments, and state law regularly interfered. New Jersey was no exception. See, e.g., Kinane v. Fay, 111 N.J.L. 553, 168 A. 724 (S.Ct.1933); Brennan v. United Hatters of North America, 73 N.J.L. 729, 65 A. 165 (S.Ct.1906) and cases cited therein. In 1930, however, the Supreme Court in Texas & New Orleans Railroad Co. v. Brotherhood of Railway and Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930), effectively overruled Adair when it held that the Railway Labor Act of 1926 was constitutional.[6] Not long thereafter Congress began the modern era of the law of labor relations when in section 7(a) of the National Industrial Recovery Act (NIRA) it provided:
 
 
 29
 Employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.
 
 
 30
 Pub.L. No. 73-67, Sec. 7(a), 48 Stat. 198 (1933). Borrowed from a similar provision in the Railway Labor Act, section 7(a) was intended to establish a federal law right to choose collective bargaining representatives. The NIRA, however, contained no effective enforcement mechanism, and experience under it led to the adoption, in 1935, of the NLRA. In that statute Congress carried forward the federal policy announced in the NIRA. It "declared to be the policy of the United States to eliminate ... obstructions to the free flow of commerce ... by protecting the exercise by workers of full freedom of association, selforganization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. Sec. 151 (1976). The first clause of section 7(a) of the NIRA was substantially copied in section 7 of the NLRA:
 
 
 31
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.
 
 
 32
 49 Stat. 449, 452 (1947); 29 U.S.C. Sec. 157 (1976). But whereas the clause in section 7(a) of the NIRA dealing with coercion of employees in the choice of collective bargaining representatives was largely precatory, section 8 of the NLRA made all forms of such coercion unfair labor practices. 49 Stat. 449, 453 (1947); 29 U.S.C. Secs. 159, 160 (1976). Moreover the NLRA created the National Labor Relations Board, gave it authority in section 9 to certify designated collective bargaining representatives, and power in section 10 to prevent unfair labor practices. 49 Stat. 449, 453 (1947); 29 U.S.C. Secs. 159, 160 (1976). Thus ever since the enactment of the NLRA employee self-organization and employee free choice has been a federal statutory right, the interference with which is an unfair labor practice which the National Labor Relations Board has power to prevent. Moreover, as originally enacted the Board's section 10 enforcement power was "exclusive, and ... not affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise." 49 Stat. 449, 453 (1947).
 
 
 33
 When the NLRA was under consideration opponents of the legislation called to the attention of Congress the issue of labor racketeering.[7] Thus Congress was not unmindful of the generic problem which section 93 of the Casino Control Act now addresses in a specific industry. Despite these rather forceful expressions from opponents of the NLRA, however, the 74th Congress placed no limitations in section 7 or section 8 upon the persons who could be chosen as collective bargaining representatives. Considering the extent to which the criminal law had been used, prior to 1935, against labor organizers, a history of which no member of Congress could have been ignorant, the omission of "racketeering" limitations on qualifications for designation as a collective bargaining representative plainly was a conscious legislative choice both in the 1933 NIRA and in the 1935 NLRA.
 
 
 34
 Before Congress next turned major attention to the subject of collective bargaining the Supreme Court was presented with the question of whether state law could determine ineligibility of collective bargaining representatives. In 1943 Florida passed a statute providing for the licensing of union business agents and prohibiting the licensing of persons who were not citizens for more than 10 years, who had been convicted of a felony, or who were not of good moral character. 1943 Fla.Laws C. 21968. The Florida statute was enacted after the Supreme Court held in Allen-Bradley Local v. Wisconsin Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942), that section 7 of the NLRA did not preempt state prohibition of mass picketing, threats of personal injury, or property damage. When an employer refused to bargain with an unlicensed business agent, the Board held that it committed an unfair labor practice. In the Matter of Eppinger & Russel Co., 56 NLRB 1259 (1944). Meanwhile in a state court the Attorney General of Florida sought injunctive relief against a union and a business agent functioning as such until licenses were obtained. The highest court of Florida enforced the statute. Hill v. State, 155 Fla. 245, 254, 19 So.2d 857 (1944). On the authority of its classic statement in Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), with respect to the preemptive effect of federal legislation, the Supreme Court reversed, holding:
 
 
 35
 Since the Labor Board has held that an employer must bargain with a properly selected union agent despite his failure to secure a Florida license, it is argued that the state law does not interfere with the collective bargaining process. But here, this agent has been enjoined, and if the Florida law is valid he could be found guilty of contempt for doing what the act of Congress permits him to do. Furthermore, he could, under Sec. 14 of the state law be convicted of a misdemeanor and subjected to fine and imprisonment. The collective bargaining which Congress has authorized contemplates two parties free to bargain, and cannot thus be frustrated by state legislation. We hold that Sec. 4 of the Florida Act is repugnant to the National Labor Relations Act.
 
 
 36
 Hill v. Florida, 325 U.S. 538, 542, 65 S.Ct. 1373, 1375, 89 L.Ed. 1782 (1945). The Court also held that, consistent with the NLRA, the Union could not be enjoined from functioning as a collective bargaining representative for failing to obtain a state license and file an annual information return. 325 U.S. at 543, 65 S.Ct. at 1375. Chief Justice Stone concurring did not agree that the states could not require that labor unions or their agents to obtain licenses or file reports. "But," he observed, "it is quite another matter to say that a state may fix standards or qualifications for labor unions and their officers and agent which would preclude them from being chosen and from functioning as bargaining agents under Sec. 7 of the National Labor Relations Act." 325 U.S. at 545, 65 S.Ct. at 1376. That is precisely what New Jersey has done in section 93. Thus the Hill Court's holding on the preclusive effect of section 7 is controlling unless it has been modified by subsequent federal legislation or overruled by the Supreme Court.
 
 
 37
 Congress had not yet reentered the field when the Court had a further opportunity to consider its position that the NLRA preempted state law respecting bargaining representatives. The occasion arose because of the Board's discretionary rulings, prior to the decision in Packard Co. v. Labor Board, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), that although foremen were covered by section 7 they were not, generally speaking, an appropriate bargaining unit. In Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947), the Court on the authority of Hill v. Florida held that a state labor board could not exercise jurisdiction to consider whether foremen bargaining units would be recognized. Justice Jackson reasoned:
 
 
 38
 If the two boards attempt to exercise a concurrent jurisdiction to decide the appropriate unit of representation, action by one necessarily denies the discretion of the other. The second to act either must follow the first, which would make its action useless and vain, or depart from it, which would produce a mischievous conflict."
 
 
 39
 330 U.S. at 776, 67 S.Ct. at 1031. Just such a mischievous conflict occurs in the instant case, since the Board has certified the Union while the Commission's proposed order will render the union ineffective as a bargaining agent unless it dismisses three key officers. The Board has consistently asserted jurisdiction over the casino industry. El Dorado Club, 151 N.L.R.B. 579 (1965) (Nevada's extensive regulation of gambling industry and concern over criminal infiltration are not reasons for declining jurisdiction under section 14(c)(1) of the NLRA).
 
 
 40
 In 1947, the Hill and Bethlehem Steel cases were the Court's definitive interpretations of the preemptive effect of sections 7 and 8. Thus, when Congress undertook a major revision of the NLRA, it was presented with an occasion to reconsider these holdings. In the Labor Management Relations Act (LMRA), enacted that year, both section 7 and section 8 were amended. In the former, as amended, Congress carried forward the language from the NIRA and the NLRA establishing federal rights of employees to form unions and to bargain collectively through representatives of their own choosing, but added a correlative "right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as recognized in section 8(a)(3)." Labor Management Relations Act of 1947, Pub.L. No. 101, ch. 120, Sec. 7, 61 Stat. 136 (1947). Section 8 was amended by the addition of a subsection dealing with unfair labor practices by unions, and the Board was given jurisdiction over these. Section 10 of the NLRA was amended by the elimination of the exclusive jurisdiction provision, and instead the Act provided that:
 
 
 41
 [The Board's] power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominately local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.
 
 
 42
 29 U.S.C. Sec. 160(a) (1976). Congress also addressed the union racketeering issue, by making it unlawful for employers to pay or labor representatives to receive money or other things of value. That prohibition was made enforceable by federal criminal and civil provisions. Pub.L. No. 101, ch. 120, Sec. 302, 61 Stat. 136 (1947); 29 U.S.C. Sec. 186 (1976). Moreover, certain boycotts and other unlawful combinations were proscribed. Pub.L. No. 101, ch. 120, Sec. 303, 61 Stat. 136 (1947); 29 U.S.C. Secs. 186-187 (1976).
 
 
 43
 The effect of the 1947 legislation was to confirm substantially the Court's interpretation of the preemptive effect of sections 7 and 8. The amendment to section 10, permitting the Board to cede jurisdiction in certain cases to state agencies, addressed the so-called no-man's land problem of NLRB declination of jurisdiction and state agency lack thereof which the Bethlehem Steel case created. Such deferral to state agencies could occur, however, only if the state agency was prepared to apply the standards of federal law. But while dealing explicitly with labor racketeering issues in sections 302 and 303 of the LMRA, and while amending section 7, Congress made no change in the federal law respecting eligibility to act as a bargaining representative. The reenactment of the original section 7 as the first clause in the amended section 7 must be considered to be a Congressional approval of the holding in Hill that state law on eligibility is preempted. Merrill, Lynch, Pierce, Fenner, & Smith v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).
 
 
 44
 When presented with the question, the Court held that "the [1947] proviso to Sec. 10(a) is the exclusive means whereby States may be enabled to act concerning the matters which Congress has entrusted to the National Labor Relations Board." Guss v. Utah Labor Board, 353 U.S. 1, 9, 77 S.Ct. 598, 602, 1 L.Ed.2d 601 (1953). The Court had in the interim decided in Automobile Workers v. O'Brien, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978 (1950), that the strike-vote provisions of the Michigan Labor Mediation Law were preempted by section 7, and in Amalgamated Assn. of Street, Electric Railway & Motor Coach Employees of America, Division 998 v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364 (1951), that section 7 preempted the Wisconsin Public Utility Anti-Strike Law. The Guss Court, in support of its holding that the deferral proviso in section 10(a) is the exclusive means whereby state law can be permitted to operate, quoted approvingly this observation in Amalgamated:
 
 
 45
 The legislative history of the 1947 Act refers to the decision of this Court in Bethlehem Steel Co. v. New York Labor Board, 330 U.S. 767 [67 S.Ct. 1026, 91 L.Ed. 1234] (1947), and, in its handling of the problems presented by that case, Congress demonstrated that it knew how to cede jurisdiction to the states. Congress knew full well that its labor legislation 'preempts the field that the act covers insofar as commerce within the meaning of the act is concerned' and demonstrated its ability to spell out with particularity those areas in which it desired state regulation to be operative.
 
 
 46
 353 U.S. at 9, 77 S.Ct. at 602 (quoting 340 U.S. at 397-98, 71 S.Ct. at 367-368). Five years after the Guss decision, in holding that a state court could not set aside a collective bargaining agreement violative of an Ohio antitrust law, the Court reiterated the authority of Hill v. Florida, Automobile Workers v. O'Brien, and Amalgamated Association v. Wisconsin Employment Relations Board. See Local 24, International Brotherhood of Teamsters v. Oliver, 358 U.S. 283, 296, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1959). Thus as the federal law stood after the enactment of the LMRA there could be no room for avoiding, in a case such as this, the binding authority of the Hill decision.
 
 
 47
 The same year that the Court reiterated the Hill preemption rule in Teamsters Union v. Oliver Congress turned its attention once again to the collective bargaining relationship. In the Labor-Management Reporting and Disclosure Act (LMRDA) it dealt even more explicitly than in section 302 of the LMRA with the problems of corruption within union leadership and of undemocratic conduct of internal union affairs. Pub.L. No. 86-257, 73 Stat. 519 (1959). The 1959 Act imposed elaborate reporting requirements and enacted a "bill of rights" for members. Title VII of the LMRDA amended the LMRA in certain respects, none of which are here relevant. Section 603(b) provides that nothing in the first six titles should be construed "to impair or otherwise affect the rights of any person under the National Labor Relations Act, as amended." Pub.L. No. 86-257, Sec. 603(b), 73 Stat. 519 (1959); 29 U.S.C. Sec. 523(b) (1976). The LMRDA also established a number of criminal sanctions. See, e.g., 29 U.S.C. Secs. 501, 502, 503-522 (1976). Because many of the proscribed activities were already crimes under state law and not protected activities under section 7 of the NLRA as amended, Congress decreed in section 604 of the LMRDA that it would not "impair or diminish the authority of any State to enact and enforce general criminal laws with respect to robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, or assault which inflicts grievous bodily injury, or conspiracy to commit any such crimes." 29 U.S.C. Sec. 524 (1976). This provision was included in recognition of the holdings in Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), and San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), that in the field of labor law preemption might apply not only with respect to activity protected by section 7, but also with respect to activity prohibited by a federal regulatory scheme. Those cases also influenced Congress to include in section 603(a) of the LMRDA a savings clause preserving state law remedies for breach of fiduciary duties. 29 U.S.C. Sec. 523(a) (1976). Finally, and of most immediate significance, Congress in section 504 of the LMRDA enacted for the first time a provision dealing explicitly with disqualifications for holding union office.[8] But while section 603(a) preserves state law remedies for breach of fiduciary duties, and section 604 preserves the states' traditional authority to enact garden variety criminal laws, there is no equivalent savings provision in section 504.
 
 
 48
 Thus in 1959 Congress, fully aware of the holding in Hill v. Florida that section 7 preempted state disqualification laws, of the rule of statutory interpretation applied in Amalgamated Association of Employers v. Wisconsin Employment Relations Board and Guss v. Utah Labor Board that Congressional deference to state law must be specific, and of the holdings in Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), and San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), that even state regulation of activity prohibited by federal law is preempted, chose to legislate on the subject of union officer disqualification with no deference to state authority, either with respect to parallel disqualification criteria or with respect to conflicting disqualification criteria. Since both disqualification and preemption were carefully considered in the same legislation no intention can be attributed to Congress other than preservation of the Hill v. Florida rule. Indeed the Senate Report on the LMRDA is explicit in this respect. "Section 305(a) is designed to further protect union members' and the public interest by establishing certain standards for persons holding union office--a matter within the purview of the Federal Government." S.Rep. No. 187, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Ad.News 2318, 2366 (emphasis supplied). Although the Commission and the Division urge otherwise, nothing in the LMRDA casts any doubt upon the continued authority of the Hill v. Florida interpretation of section 7 of the NLRA.
 
 
 49
 We note at this point that there are in labor law two separate preemption doctrines. The first, covering protected activity, is absolute.
 
 
 50
 When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by Sec. 7 of the National Labor Relations Act, or constitute an unfair labor practice under Sec. 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.
 
 
 51
 San Diego Building Trades Council v. Garmon, 359 U.S. at 244, 79 S.Ct. at 779. On the other hand, where the activity in question is not specifically protected by section 7 but is nevertheless federally regulated, a case by case determination of the interaction between state and federal regulatory schemes is required. E.g., Farmer v. Carpenters, 430 U.S. 290, 296, 97 S.Ct. 1056, 1061, 51 L.Ed.2d 338 (1977); Motor Coach Employees v. Lockridge, 403 U.S. 274, 279-98, 91 S.Ct. 1909, 1914-1924, 29 L.Ed.2d 473 (1971); Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 59-60, 86 S.Ct. 657, 661-662, 15 L.Ed.2d 582 (1966). The Hill v. Florida rule, and this case, fall in the first category. Choice of a bargaining representative is totally protected by section 7, except to the extent that the bargaining representative may be disqualified under section 503(a) of the LMRDA. No section 504 LMRDA disqualification applies to this Union's officers.[9] Thus there is neither occasion nor justification for engaging in weighing or balancing. State disqualification statutes which go beyond section 504 simply cannot operate in interstate commerce to disqualify otherwise eligible bargaining representatives.
 
 
 52
 The Commission and the Division place their chief reliance on one post-LMRDA case, DeVeau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960), which they contend overruled Hill v. Florida. DeVeau involved a challenge on preemption grounds to the constitutionality of section 8 of the New York Waterfront Commission Act of 1953, which disqualified from office in any waterfront labor organization convicted felons who had not been pardoned. The New York legislation and companion legislation in New Jersey were adopted pursuant to an interstate compact between those states. The compact was submitted to Congress, as required by article I, section 10 of the Constitution, and after hearings in both the House and Senate was approved. Nevertheless a disqualified union officer contended that the state statute was preempted by sections 1 and 7 of the NLRA. Justice Frankfurter rejected that contention, observing:
 
 
 53
 In light of the purpose, scope and background of this New York legislation and Congress' relation to it, such an inference of incompatibility has no foundation. In this case we need not imaginatively summon the likely reaction of Congress to the state legislation, as a basis for ascertaining whether due regard for congressional purpose bars the state regulation. Here the States presented their legislative program to cope with an urgent local problem to the Congress, and the Congress unambiguously supported what is the core of this reform. Had Sec. 8 [of the New York law] been written into the compact, even the most subtle casuistry could not conjure up a claim of pre-emption.
 
 
 54
 363 U.S. at 153, 80 S.Ct. at 1151. He also rejected the contention that the enactment of the LMRDA, subsequent to Congressional approval of the compact, vitiated prior approval. Frankfurter's opinion did not command a majority, but even in speaking for himself and the three justices who joined in it he was careful not to intimate that Hill v. Florida was overruled. The absence of any such suggestion is significant, since Frankfurter had dissented in Hill v. Florida. 325 U.S. at 547, 65 S.Ct. at 1377. Obviously he was unable in DeVeau to find support for the adoption of his dissenting position. Justice Brennan, whose separate brief opinion was critical for the judgment, made it clear that he relied on Congressional intent in approving the compact. 363 U.S. at 162, 80 S.Ct. at 1156. The dissenting justices, who noted that the justices in the majority were not overruling Hill v. Florida, disagreed only about the proper construction of the compact. 363 U.S. at 161, 163, 80 S.Ct. at 1155, 1156 (Douglas, J., dissenting). The DeVeau case cannot, therefore, be read as impairing the authority of Hill v. Florida.
 
 
 55
 The Commission and the Division also urge that Hill v. Florida is distinguishable because the Florida statute there involved was of a general nature, while section 93 is restricted to the casino industry, which is a matter of particular state concern. For several reasons we must reject that effort to avoid the precedential effect of Hill v. Florida. In the first place sections 86 and 93 are not even restricted to casino employees. They cover casino hotel employees, who by definition do not work in the casinos. It is too late to suggest that places of public accommodation are not engaged in interstate commerce. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Moreover, even if the state legislation were restricted to employees employed directly in the casinos we would find the argument based on the state's deep interest in that business unpersuasive. Essentially the same argument was rejected when as a reason for avoiding federal preemption, states asserted their deep interest in the operation of state franchised public utilities. Amalgamated Association of Employees v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364 (1950). Congress has given the states the option, with respect to areas in which they have a deep interest, of relegating activities in those areas to political subdivisions. 29 U.S.C. Sec. 152(2) (1976); NLRB v. Natural Gas Utility District, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971). Indeed New Jersey has exercised that option with respect to its lottery. N.J.Stat.Ann. 5:9-4 (West 1973). Congress has not, however, given the states the further option of deciding for themselves which areas of private enterprise can be so cloaked with the mantle of state interest as to be placed outside the preemptive scope of section 7 of the NLRA. The state argues that it should have that option at least for the gambling industry, because that industry is uniquely attractive to unwholesome elements in our society. Recognition of such a doctrine, however, could not be confined to the gambling industry. Other industries in which the state is vitally interested have also been identified as susceptible of infiltration by organized crime.[10] The problem of organized crime is a national one, which Congress has addressed both in criminal statutes, e.g., 18 U.S.C. Secs. 1961-1968 (1976 & Supp. IV 1980), and by permitting general state criminal law to operate against labor union officials. 29 U.S.C. Sec. 524 (1976). That problem cannot be relied upon by the states to Balkanize the law with respect to choice of collective bargaining representatives in non-exempt interstate commerce.
 
 
 56
 We conclude, therefore, that none of the arguments advanced by the Commission and the Division can avoid the controlling law announced in Hill v. Florida. Section 93 of the Casino Control Act is preempted by section 7 of the NLRA insofar as it purports to confer on the Commission authority to disqualify as bargaining representatives the duly elected or selected officials of a union certified by the Board as exclusive bargaining agent. Thus the trial court's doubts about the Union's ultimate success on the merits, insofar as they were based on doubts about the preemptive effect of section 7, were groundless.
 
 V.
 Federal Regulation of Pension Funds
 
 57
 Following the enactment in 1959 of the LMRDA the next relevant Congressional legislation in the field of employer-employee relations was the enactment, in 1974 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001-1381 (1976). ERISA embodies a comprehensive legislative scheme which spells out in great detail the respective roles of the states and the federal government with respect to employee benefit plans. See 29 U.S.C. Sec. 1001 (Congressional findings and declaration of policy). Section 514(a) of ERISA provides:
 
 
 58
 Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.
 
 
 59
 29 U.S.C. Sec. 1144. The two plans of which Mr. Gerace is a trustee are employee benefit plans falling within the coverage of ERISA, and thus within section 514. Under the statute "[t]he term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. Sec. 1144(c)(1). "The term 'State' includes ... any agency ... which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter." 29 U.S.C. Sec. 1144(c)(2). We have previously discussed the legislative history of ERISA's comprehensive preemption section, finding that it "make[s] plain that the preemptive intent is just as broad as its language suggests." Buczynski v. General Motors Corp., 616 F.2d 1238, 1250 (3d Cir.1980), aff'd sub nom Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981).
 
 
 60
 Despite section 514 the Commission and the Division contend that section 93(b) does not "relate to any employee benefit plan." That contention is belied by the plain language of the New Jersey statute:
 
 
 61
 No labor organization ... may administer any pension or welfare funds, if any officer ... is disqualified in accordance with the criteria contained in section 86 of [the] act.
 
 
 62
 N.J.Stat.Ann. 5:12-93(b). These words cannot seriously be said not to "relate to any employee benefit plan." 29 U.S.C. Sec. 1144(a). ERISA states that statutes relating to employee benefit plans are preempted even when their effect is indirect. 29 U.S.C. Sec. 1144(c)(2). These preemption subsections have been definitively construed by the Supreme Court. "ERISA's authors clearly meant to preclude the States from avoiding through form the substance of the preemption provision." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981). In light of that construction the contention that section 93 and ERISA may lawfully coexist is fanciful.
 
 VI
 Propriety of Injunctive Relief
 
 63
 Since in Parts IV and V of this opinion we conclude that the Union's claims that section 93 is preempted by section 7 of the NLRA and section 514 of ERISA are meritorious, we turn to the question whether the requested preliminary injunctive relief against the proceeding pending before the Commission should have been granted. Federal law standards for such relief are clear. They include the likelihood of the moving party succeeding on the merits at final hearing, the likelihood of irreparable harm to the moving party pendente lite if no relief is granted, the possibility of harm to other interested parties from the grant of such relief, and the public interest. E.g., Constructors Association v. Kreps, 573 F.2d 811, 815 (3d Cir.1978); Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir.1975).
 
 
 64
 Our discussion in Parts IV and V is dispositive of the first factor. Since section 93 cannot coexist with section 7 of the NLRA and section 514 of ERISA, the district court should have recognized that sooner or later the Union's objection to the Division's efforts to deprive it of dues revenues and make it ineligible to maintain pension and welfare funds must prevail.
 
 
 65
 Moreover the application of the second factor, irreparable harm pendente lite, seems plain. Irreparable harm pendente lite includes at least that kind of harm which cannot be rectified after final hearing by an award of money damages. Clearly that was threatened when the Division moved before the Commission for an order disqualifying the Union from collecting dues from its 8000 plus members employed by casino hotels. Had the order gone into effect, the Union would either have been deprived of the financial wherewithall to carry on its collective bargaining responsibilities or have deposed those duly elected officers whom the membership selected as their collective bargaining representatives. In neither case would it be possible, long after the event, to measure in money and compensate for the harm to the ongoing collective bargaining relationship from intangibles such as erosion of members' confidence in their chosen collective bargaining organization, delay in the process of grievances, or disruption of internal union affairs. The Division, while pressing forward with its effort to obtain disqualification, makes the disingenuous argument that "[a]t the conclusion of the hearing, the Commission could find the Union totally qualified, in which case the present proceeding might arguably become moot." Brief for Appellees/Cross Appellants (Division) at 48. In fact, however, in the absence of a preliminary injunction the Division pressed forward, diverting the Union's efforts to the defense of that illegal proceeding rather than the performance of its normal functions as the certified bargaining representative of its members.
 
 
 66
 Nor can the Division or the Commission point to any irreparable harm to them or to the casino industry from an injunction pending a judicial resolution of the contention that section 93 cannot be applied to the Union. Both point to the necessity for maintaining integrity in the casino industry, but there are ample means available to that end short of disqualifying duly certified bargaining representatives. No showing was made in the district court that the potential infiltration of the casino industry by criminal elements operating through the Union would become an actuality before final hearing.
 
 
 67
 Finally there is the matter of the public interest. Obviously the first place to look for that interest is the governing law, which in this case is federal. The extent of the national public interest in preventing state agencies from purporting to exercise a jurisdiction which is the exclusive preserve of the Board may be judged by cases recognizing that the Board can obtain injunctive relief against the exercise of such jurisdiction by state courts both before and after the General Counsel has filed a Board charge. NLRB v. Nash-Finch Co., 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971); Capital Service, Inc. v. NLRB, 347 U.S. 501, 74 S.Ct. 699, 98 L.Ed. 887 (1954).[11] Moreover even if a state court were to attempt to enforce an order in a preempted labor area the national public interest in preserving federal preemption is so strong that the order could be disobeyed without fear of being held in contempt. In re Green, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (1962).
 
 
 68
 Against the clear national public interest in preventing erosion of the exclusive role of section 7 in determining collective bargaining representatives the Commission and the Division is arrayed the artillery of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The district court was unpersuaded by these big guns, and so are we.
 
 
 69
 Pullman abstention would at most have required that the district court retain jurisdiction while a narrowing construction of section 93 which might avoid the constitutional adjudication was sought from a New Jersey tribunal. Before the complaint was filed the Commission had already ruled that it could not consider the Union's preemption claim. Moreover the defendants never suggested any construction of section 93 which could avoid deciding the preemption issue. The Union was certified by the Board with the present officers. Section 93 says that it may be disqualified if the Commission decides some of them fall within the criteria in section 86. Pullman abstention would be an exercise in futility. Moreover, even if the district court had decided to abstain pending the Commission's interpretation of section 93 it would still have been obliged to consider the grant of preliminary injunctive relief from harm pendente lite. New Jersey-Philadelphia Presbytery v. New Jersey State Board of Higher Education, 654 F.2d 868, 886 (3d Cir.1981).
 
 
 70
 Burford v. Sun Oil Co. has no application. As the district court noted, the questions of state law presented by sections 93 and 86 are neither technical nor complex. 536 F.Supp. at 325. Moreover no argument can be entertained based on disruption of a state administrative scheme in a case in which the court is asked to decide whether the very existence of that scheme violates a paramount federal statute. A fortiori that is so when, as here, the state agency lacks authority even to entertain the preemption challenge.
 
 
 71
 As to the Younger v. Harris line of cases, we reiterate the point made in New Jersey-Philadelphia Presbytery v. New Jersey State Board of Higher Education, that, absent federal district court intervention, state agency orders which operate as prior restraints upon the exercise of federally protected rights may by virtue of the final judgment rule in 28 U.S.C. Sec. 1257 (1976), escape any federal appellate review for long periods. 654 F.2d at 884. Moreover, the federal policy of preventing state courts from eroding rights guaranteed by section 7 is so important that as a matter of federal law a state court is without power to hold one in contempt for violating an order it had no power to enter. In re Green, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (1962). See also Amalgamated Association v. Wisconsin Employment Relations Board, 340 U.S. 383, 386, 399, 71 S.Ct. 359, 361, 368, 95 L.Ed. 364 (1951). Even pending state proceedings may be enjoined on preemption grounds. NLRB v. Nash-Finch Co., 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971); Capital Service, Inc. v. NLRB, 347 U.S. 501, 74 S.Ct. 699, 98 L.Ed. 887 (1954). These authorities suggest that when the issue tendered to a federal district court is the very power, as a matter of federal law, to entertain a threatened proceeding, the principles of comity and federalism which apparently animate the Younger v. Harris rule are totally inapplicable. Certainly we cannot hold that the district court committed an abuse of discretion in holding a hearing on the Union's motion for a preliminary injunction.
 
 
 72
 Given that the Union's contentions based on section 7 of the NLRB and section 514 of the LMRDA are meritorious, that there was a strong likelihood of harm pendente lite to its status as a collective bargaining representative, that no commensurate harm to the defendants would have resulted from the grant of pendente lite relief, and that a strong national public interest exists in preventing the unlawful exercise of state agency jurisdiction in a preempted area, we hold that the trial court should have granted a preliminary injunction pending final hearing against the enforcement of section 93(b) in any manner inconsistent with 29 U.S.C. Sec. 504.
 
 VII
 Overbreadth and Vagueness
 
 73
 Because the statutory supremacy issues which we have discussed in Parts III and IV suffice to dispose of this appeal, we have no occasion to pass upon the Union's overbreadth and vagueness contentions. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).
 
 VIII
 Conclusion
 
 74
 The order appealed from in No. 82-5210 will be reversed and the case remanded to the district court for the entry of an order enjoining the Commission and the Division from taking any action, pending final hearing, to enforce section 93 against the Union. The cross appeals, Nos. 82-5234 and 82-5260, will be dismissed for lack of jurisdiction.
 
 
 75
 BECKER, Circuit Judge, concurring in part and dissenting in part.
 
 
 76
 I concur in that part of the majority's opinion which holds that ERISA precludes the Casino Control Commission from regulating the management of pension and welfare funds.[1] And, though I do not agree with the majority's conclusion that we lack jurisdiction over the cross-appeals,[2] I nevertheless share the majority's view that the district court was correct in declining to abstain.[3]
 
 
 77
 I cannot subscribe, however, either to the sweeping preemptive scope that the majority ascribes to the NLRA and the LMRDA or to the holding that section 7 of the NLRA precludes New Jersey from restricting who may hold office in unions representing employees in the casino industry. Relying primarily on Hill v. Florida ex rel. Watson, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945), and Congress' subsequent failure to overrule Hill, the majority fashions a preemption doctrine that appears to leave no room for state regulation that affects section 7 rights. As I read the relevant case law, however, preemption doctrine is far from absolute, and the strength and importance of New Jersey's interest in enacting a comprehensive regulatory scheme is critical to a determination whether the provisions challenged here constitute an impermissible intrusion on federally created and protected rights. After considering two post-Hill manifestations of congressional intent strongly suggesting that state regulation is not necessarily inconsistent with national labor policy, the colossal problems associated with casino gambling, and New Jersey's interest in attempting to prevent the incidence of such problems and the poisoning of its polity, I conclude that federal labor law does not preempt the Casino Control Act's restrictions on the right of casino-industry employees to select certain individuals as union officials. Accordingly, I dissent from so much of the majority's opinion and judgment that reaches the contrary conclusion.
 
 
 78
 I. Labor Preemption--The Generally Applicable Principles
 
 
 79
 Appellants' preemption argument is relatively straightforward: section 7 of the NLRA, 29 U.S.C. Sec. 157 (1976), guarantees employees the right "to bargain collectively through representatives of their own choosing." Section 93 of the Casino Control Act, however, precludes casino employees from selecting as their bargaining representatives individuals who do not meet the Act's qualification criteria. If employees ignore the statute's admonition, the Casino Control Commission may prevent their union from collecting dues from its members, thus vitiating the union's ability to function. Appellants argue that this restriction impermissibly intrudes on their unqualified section 7 right to select their collective bargaining representatives. Indeed appellants go so far as to say that section 93's operation would "totally disrupt and prevent the application to [the casino] industry of federal policies as expressed by the [NLRA]." Br. for Appellants at 13.
 
 
 80
 The majority's reaction to this contention is aptly characterized by the following passage:
 
 
 81
 [T]here are in labor law two separate preemption doctrines. The first, covering protected activity, is absolute. 'When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by Sec. 7 of the [NLRA], or constitute an unfair labor practice under Sec. 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the states free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.' ... On the other hand where the activity in question is not specifically protected by section 7, but is nevertheless federally regulated, a case by case determination of the interaction between state and federal regulatory schemes is required. The Hill v. Florida rule, and this case, fall in the first category.
 
 
 82
 Majority op., at 828 (quoting San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)). Although this formulation supports the majority's judgment, it does so only by drawing an inaccurate distinction and by oversimplifying preemption analysis.
 
 
 83
 There are certain areas in which congressional action precludes the states from regulating at all. But Congress generally does not identify these areas by creating amorphous categories of "protected activity." Rather, the areas in which Congress has usurped the field are generally defined by explicit statutory language (and, in certain rare situations, legislative history). One example of which the majority itself takes note is ERISA, which states:
 
 
 84
 Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.
 
 
 85
 29 U.S.C. Sec. 1144 (1976); see Majority op., at 830. Similar examples may be found in various individual provisions of the NLRA and the LMRDA. E.g., 29 U.S.C. Secs. 164(a), 483 (1976) (discussed infra at pp. 838 n. 5, 841).
 
 
 86
 Most federal statutes, however, do not wear their preemptive nature on their sleeves; many provisions of federal labor law, including section 7 of the NLRA, fall into this latter category. See New York Telephone Co. v. New York State Department of Labor, 440 U.S. 519, 540, 99 S.Ct. 1328, 1341, 59 L.Ed.2d 553 (1979) (plurality op.). Obviously, it would be a mistake to infer from such statutory silence that any and all state regulation is permissible. But it also would be a mistake hastily or uncritically to characterize the particular conduct governed by such federal statutes as "plainly within the central aim of federal regulation" and therefore beyond the reach of the states. As Justice Frankfurter wrote in De Veau v. Braisted, 363 U.S. 144, 153, 80 S.Ct. 1146, 1151, 4 L.Ed.2d 1109 (1960) (plurality op.): "It would misconceive the constitutional doctrine of preemption ... to decide this case mechanically on an absolute concept of free choice of representatives on the part of employees, heedless of the light that Congress has shed for our guidance."
 
 
 87
 Our task, therefore, is more complex than the majority suggests: in order for us properly to determine the implicit preemptive scope of a federal statute, we must examine thoroughly the purposes and policies of the federal scheme and the extent to which state regulation would be incompatible.
 
 
 88
 The fact that there is some restriction due to the operation of state law does not settle the issue of preemption. The doctrine of pre-emption does not present a problem in physics but one of adjustment because of the interdependence of federal and state interests and of the interaction of federal and state powers.
 
 
 89
 Id. at 152, 80 S.Ct. at 1151.
 
 
 90
 The Supreme Court recently has restated the direction that our inquiry must take in this context:
 
 
 91
 First, we determine whether the conduct that the state seeks to regulate or to make the basis of liability is actually or arguably protected or prohibited by the NLRA.... [I]f the conduct at issue is arguably prohibited or protected otherwise applicable state law and procedures are ordinarily preempted.... When, however, the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the state of the power to act, we refuse to invalidate state regulation or sanction of the conduct.... The question of whether regulation should be allowed because of the deeply-rooted nature of the local interest involves a sensitive balancing of any harm to the regulatory scheme established by Congress, either in terms of negating the [NLRB's] exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the state as a protection to its citizens.
 
 
 92
 Local 926, International Union of Operating Engineers v. Jones, --- U.S. ----, 103 S.Ct. 1453, 1458-59, 75 L.Ed.2d 368 (1983)[4] (citations omitted) (holding state-court action preempted when conduct at issue arguably constituted unfair labor practice, even though NLRB declined to issue complaint). Proceeding within Local 926's framework, I therefore turn first to the question whether Congress intended section 7 to preempt all attempts by states to impose criteria on whom employees may select as their bargaining representatives. Having determined that all such regulation does not run afoul of congressional intent, I then explain why New Jersey's interest in prohibiting certain individuals from representing employees in the casino industry is so "deeply rooted in local feeling and responsibility" that it justifies any resulting intrusion on section 7 rights.
 
 II. Congressional Preemptive Intent
 
 93
 Like the majority, I look to that most elusive of guides--congressional intent--to determine whether state-imposed restrictions like those of the Casino Control Act are compatible with federal labor policy. Unlike the majority, however, I conclude from two manifestations of that intent--the enactment of the LMRDA and congressional acquiescence in the state-imposed restrictions upheld in De Veau v. Braisted --that national labor policy permits state-imposed restrictions in certain circumstances. Before turning to those factors, however, I first explain why Hill v. Florida's explication of congressional intent is not dispositive here.
 
 A. Hill v. Florida
 
 94
 I agree with the majority that the starting point for our analysis must be Hill v. Florida, supra, for Hill represents the seminal explication of section 7's preemptive scope.[5] I disagree, however, with the majority's conclusion that the Hill Court's reading of congressional intent remains either definitive or controlling.
 
 
 95
 At issue in Hill were two provisions of a Florida statute governing all labor unions operating within the state. Section 4 of the law required that anyone serving as the "business agent" of a union be licensed by a three-man board composed of the Governor, the Secretary of State, and the Superintendent of Education. The section also provided that licenses would be issued only to individuals who had been citizens of the United States for at least ten years, had not been convicted of a felony, and were of "good moral character."
 
 
 96
 The second contested provision, section 6, required every labor union operating within the state to file with the Secretary of State annual written reports containing the name of the union, the location of its offices, and the names and addresses of all union officers. The filing of these reports was a prerequisite to a union's obtaining a license to function within the state; failure to comply with either section 4 or section 6 was punishable as a misdemeanor.
 
 
 97
 Hill, a business agent within the meaning of the Florida law, and his union, Local No. 234 of the United Association of Journeymen Plumbers and Steamfitters, failed to register with the state and to obtain the licenses required by sections 4 and 6. Alleging violations of the Act, the Florida Attorney General successfully sued in state court for injunctions against Hill's further functioning as the union's business agent and the union's further functioning at all until each complied with the statutory requirements.
 
 
 98
 The Florida Supreme Court upheld the injunctions; the United States Supreme Court reversed, finding both injunctions inconsistent with the NLRA. With regard to section 4, the Court stated:
 
 
 99
 Since the Labor Board has held that an employer must bargain with a properly selected union agent despite his failure to secure a Florida license, it is argued that the state law does not interfere with the collective bargaining process. But here, this agent has been enjoined, and if the Florida law is valid he could be found guilty of a contempt for doing that which the act of Congress permits him to do. Furthermore, he could ... be convicted of a misdemeanor and subjected to fine and imprisonment. The collective bargaining which Congress has authorized contemplates two parties free to bargain, and cannot thus be frustrated by state legislation. We hold that Sec. 4 of the Florida Act is repugnant to the National Labor Relations Act.
 
 
 100
 325 U.S. at 542, 65 S.Ct. at 1375. The Court reached a similar conclusion regarding section 6. Id. at 543, 65 S.Ct. at 1375.
 
 
 101
 Relying on this holding, the majority reads Hill as standing for the proposition that section 7 precludes the states from fixing standards or qualifications for labor unions, their officers, or their agents if such standards or qualifications would preclude the unions or their representatives from being chosen and functioning as bargaining agents under section 7 of the NLRA. The majority therefore concludes that section 93 of the Casino Control Act is preempted.
 
 
 102
 Although section 93 of the Casino Control Act does attempt to define qualifications for union officials in the casino industry, I disagree with the majority's conclusion that Hill therefore requires us to invalidate it. The central distinction between Hill and this case concerns the challenged laws themselves. The Florida statute at issue in Hill did nothing but establish qualification criteria for the officials of all labor unions in the state. Apparently the state's sole purpose was the regulation of labor unions. Section 93 of the Casino Control Act, by contrast, does not seek to regulate all unions, but only those with members working in the casino industry. Moreover, section 93 is part of a larger regulatory scheme whose purpose is by no means labor-oriented. Thus Hill's rejection of Florida's attempt to establish qualifications for all union officials does not lead inexorably to the conclusion that the legislation here at issue also is inconsistent with congressional intent.[6]
 
 
 103
 The majority seeks to buttress its construction of congressional intent by focusing on Congress' having twice enacted major labor legislation without overruling Hill. In particular, the majority asserts that Taft-Hartley's "reenactment of the original section 7 ... must be considered to be a Congressional approval of the holding in Hill that state law on eligibility is preempted." Majority op., 826. The majority reaches a similar conclusion regarding the effect of the LMRDA:
 
 
 104
 [I]n 1959 Congress, fully aware of the holding in Hill v. Florida that section 7 preempted state disqualification laws, of the rule of statutory interpretation ... that Congressional deference to state law must be specific, and of the holdings ... that even state regulation of activity prohibited by federal law is preempted, chose to legislate on the subject of union officer disqualification with no deference to state authority, either with respect to parallel disqualification criteria or with respect to conflicting disqualification criteria. Since both disqualification and preemption were carefully considered in the same legislation no intention can be attributed to Congress other than preservation of the Hill v. Florida rule.
 
 
 105
 Majority op., at 828.
 
 
 106
 Although appealing, this dwelling on non-events relies too heavily on the Supreme Court's approach in Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). In Curran, the Supreme Court, addressing Congress' failure to eliminate judicially created private causes of action, stated:
 
 
 107
 [T]he fact that a comprehensive reexamination and significant amendment of the [Commodities Exchange Act] left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy.
 
 
 108
 Id. at 381-82, 102 S.Ct. at 1840-41 (footnote omitted). But the Supreme Court's approach in Curran cannot be taken too far; nor can it automatically be transferred to other contexts. First, as Curran itself noted, congressional inaction is only evidence of congressional acquiescence; neither in Curran nor elsewhere has the Supreme Court said that such inaction resolves the question of congressional intent. Indeed Curran itself went on to review the particulars of the legislative history in order to confirm the Court's belief that Congress intended to preserve the private remedy. See id. at 382-88, 102 S.Ct. at 1841-44.
 
 
 109
 More importantly, Curran's formulation was adopted in a simpler context: Congress either did or did not intend to create a private right of action. By contrast, the question whether Congress intended to preempt state regulation of labor unions cannot so easily be answered in one case for all future cases. Rather, the answer will depend on the type and extent of regulation, the industry involved, the need for such regulation--in short, on the circumstances of each case, see Local 926 v. Jones, supra, 103 S.Ct. at 1458-59. Thus woodenly to transfer the Curran approach to the more fluid context of labor-law preemption at once overestimates the comprehensiveness of congressional decisionmaking and underestimates the complexity of preemption doctrine.
 
 
 110
 In fact, it would be manifestly unrealistic to expect Congress to have contemplated, addressed, and resolved all (or even most) of the potential state/federal conflicts arising from overlapping regulatory schemes. As Professor Summers has pointed out in discussing the preemptive effect of the LMRDA:
 
 
 111
 Congress did not, and could not, work out in detail the coordination of federal and state law. To do so would require at the very least a comprehensive knowledge of existing state law and the kinds of cases which came before the courts. Furthermore, it would require a clear understanding by Congress of what it was prescribing as federal law. Congress lacked both of these since such precision of knowledge and understanding is not possible.
 
 
 112
 Summers, Pre-emption and the Labor Reform Act--Dual Rights and Remedies, 22 Ohio State L.J. 119, 152 (1961); cf. United States v. Little Lake Misere Land Co., 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973) (noting the "inevitable incompleteness presented by all legislation"). I do not suggest that Congress was unaware of Hill or of extant preemption jurisprudence. Nor do I suggest that we can or should ignore Congress' failure to disavow Hill. But I cannot agree with the majority that we must read that failure as a congressional stamp of approval.
 
 
 113
 In short, I do not view either Hill's explication of congressional purpose or Congress' failure to reject Hill's holding as dispositive evidence of congressional intent to preempt all state legislation regulating union officials. Moreover, the majority's attempt to parlay the 1945 Hill decision into a current and continuing expression of congressional intent is belied by more recent manifestations of congressional intent that suggest the contrary. I turn now to these.
 
 B. The LMRDA
 
 114
 As the majority correctly points out, the NLRA, as originally enacted, placed no restrictions on employees' choice of representatives. "Their own best judgment, not that of someone else, was to be their guide." Hill v. Florida, supra, 325 U.S. at 541, 65 S.Ct. at 1374. In 1959, however, Congress enacted the LMRDA, Pub.L. No. 86-257, 73 Stat. 519 (1959), explicitly recognizing the danger of criminal infiltration of the labor movement. See H.R.Rep. 741, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Ad.News 2424, 2431. In particular, section 504(a) provides that individuals convicted of various felonies are prohibited from holding union office for five years.[7] 29 U.S.C. Sec. 504(a) (1976). Thus, whether or not restrictions on who may hold union office would be inconsistent with the unqualified free choice that the majority would read into the original section 7, Congress itself has established that the choice is no longer unfettered and that national labor policy admits of some such limitations.
 
 
 115
 The majority holds, however, that although the LMRDA promulgates federal criteria for the holding of union office, it does not permit the states to impose the additional and more stringent criteria at issue here. To support its position, the majority points out that two provisions of the LMRDA, sections 603(a) and 604, contain "savings clauses" that explicitly recognize the right of the states to provide remedies beyond those provided by the statute; Congress did not append such a clause to section 504, however, and the majority therefore infers a congressional intent to preclude the states from imposing more stringent disqualification criteria.
 
 
 116
 That conclusion is incorrect for several reasons. First, the majority fails to mention that at least one other section of the LMRDA is expressly preemptive: section 483 states that "[t]he remedy provided by this subchapter for challenging an election already conducted shall be exclusive." 29 U.S.C. Sec. 483 (1976). Thus it is possible to draw an inference, at least as strong as the majority's, that Congress intended to preempt only when it did so explicitly.
 
 
 117
 A more realistic approach is that the LMRDA's erratic allocation of enforcement jurisdiction between the state and federal governments makes futile any attempt to divine congressional intent from the absence of a savings clause in section 504. As the minority report accompanying the Senate version of the LMRDA protested:
 
 
 118
 The ... bill distributes its remedies ... in accordance with no discernible standard or consistent principle. Some remedies are exclusively Federal, some are left to the States and denied to the Federal Government, some are given to the States but only if they apply Federal law, and some are allocated to both the States and Federal Government. In some instances, the majority insisted upon exclusive Federal jurisdiction asserting that absolute uniformity was essential; in others, it was insisted that diversity of treatment under varying State laws was absolutely necessary.
 
 
 119
 S.Rep. No. 187, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Ad.News 2318, 2407; see also Summers, supra, 22 Ohio St.L.J. at 122 ("Congressional fear of destroying valuable state remedies without providing adequate federal substitutes, and the spectre of creating a new 'no man's land,' routed all objections toward overlapping and possibly conflicting remedies. The statute became studded with assorted provisions cut from different patterns.").
 
 
 120
 More important, the majority incorrectly asserts that neither of the savings clauses subsumes the subject matter of section 504. Section 603(a) declares:
 
 
 121
 Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organization is interested, under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State.
 
 
 122
 29 U.S.C. Sec. 523(a) (1976).[8] The majority contends that the only state-law remedies that this provision preserves are those for breach of fiduciary duties by union officials. See Majority op., at 25. Not only is there no support in the legislative history for such a narrow construction, see Summers, supra, 22 Ohio State L.J. at 122, 140, but the Supreme Court expressly rejected it in De Veau v. Braisted, supra: "Sec. 603(a) is an express disclaimer of pre-emption of state laws regulating the responsibilities of union officials, except where such preemption is expressly provided...." 363 U.S. at 157, 80 S.Ct. at 1153.[9] Although the language was that of a four-Justice plurality, Justice Brennan, who provided the fifth vote, explained in a concurrence that the LMRDA "explicitly provides that it shall not displace such legislation of the States."[10] Id. at 160-61, 80 S.Ct. at 1154-1155; see also Local 1804, International Longshoremen's Ass'n v. Waterfront Commission, 85 N.J. 606, 613, 428 A.2d 1283, 1287 (1981) (relying in part on section 603(a)'s savings clause in concluding that section 504 of the LMRDA does not preempt section 8 of the New Jersey Waterfront Commission Act).
 
 
 123
 Finally, it is important to note that one of the factors that motivated Congress to enact the LMRDA was the inability of the states to deal effectively with criminal infiltration of unions. "The LMRDA was adopted in large part because state and local authorities had failed to adopt 'effective measures to stamp out crime and corruption [in unions] and guarantee internal union democracy....' Consistent with this legislative purpose, Congress could reasonably allow a state to adopt more restrictive eligibility requirements...." International Longshoremen's Association v. Waterfront Commission, 495 F.Supp. 1101, 1123 (S.D.N.Y.1980), affirmed in part and reversed in part on other grounds, 642 F.2d 666 (2d Cir.), cert. denied, 454 U.S. 966, 102 S.Ct. 509, 70 L.Ed.2d 383 (1981). In short, it is simply too late to assert that the LMRDA supersedes section 93 of the Casino Control Act; the more reasonable interpretation is that Congress viewed such legislation as complementing the federal scheme.
 
 C. De Veau v. Braisted:
 
 124
 Congressional Acquiescence in State Imposed Restrictions
 
 
 125
 In addition to establishing the non-preemptive effect of the LMRDA, De Veau sheds considerable light on the preemptive scope of the NLRA. De Veau was an officer of the Longshoremen's Union against whom New York invoked section 8 of its Waterfront Commission Act of 1953, a provision quite similar to the one at issue here. Section 8 provided that no one could collect dues on behalf of a waterfront union if any officer or agent of the union had been convicted of a felony and either had not been pardoned by the governor or had not received a good conduct certificate from the parole board.[11] De Veau contended that the law impermissibly restricted the rights guaranteed by sections 1 and 7 of the NLRA.
 
 
 126
 The Supreme Court upheld the New York statute. Section 8, the Court explained in a plurality opinion by Justice Frankfurter, was enacted in conjunction with and in furtherance of an interstate compact between the states of New York and New Jersey. The compact, which established the bi-state Waterfront Commission of New York Harbor, had been approved by Congress pursuant to Article I, section 10 of the United States Constitution. Waterfront Commission Compact, Pub.L. No. 83-252, 67 Stat. 541 (1953). It therefore could not be maintained that section 8 was inconsistent with congressional intent.[12]
 
 
 127
 Appellants contend that the absence of a similar compact in this case renders De Veau inapposite here. This argument, however, ignores three critical aspects of De Veau. First, four Justices explicitly rejected an inference of congressional intent to preempt all state legislation relating to employee choice of collective bargaining representatives; rather, they framed the issue as
 
 
 128
 whether we may fairly infer a congressional purpose incompatible with the very narrow and historically explained restrictions upon the choice of a bargaining representative embodied in Sec. 8 of the New York Waterfront Commission Act. Would Congress, with a lively regard for its own federal labor policy, find in this state enactment a true, real frustration, however dialectically plausible, of that policy?
 
 
 129
 363 U.S. at 153, 80 S.Ct. at 1151. Congressional approval of the Waterfront Commission Compact made answering that question easy in De Veau: "In this case we need not imaginatively summon the likely reaction of Congress to the state legislation, as a basis for ascertaining whether due regard for congressional purpose bars the state regulation." Id. But Justice Frankfurter's formulation strongly implies that a court without access to similarly conclusive extrinsic evidence nevertheless should attempt to determine whether Congress would have intended to preclude the particular state legislation at issue.
 
 
 130
 Second, De Veau expressly recognized the importance of considering the particular situation and regulation at issue, rather than adopting a blanket approach to the preemption question.[13] Distinguishing Hill v. Florida, supra, Justice Frankfurter wrote:
 
 
 131
 Nor was it true of Hill v. Florida, as it is here, that the challenged state legislation was part of a program, fully canvassed by Congress through its own investigations, to vindicate a legitimate and compelling state interest, namely, the interest in combatting local crime infesting a particular industry.
 
 
 132
 363 U.S. at 155, 80 S.Ct. at 1152; see also id. at 154, 80 S.Ct. at 1151 ("It is instructive that this unique provision has occurred in connection with approval of a compact dealing with the prevention of crime where, because of the peculiarly local nature of the problem, the inference is strongest that local policies are not to be thwarted.").
 
 
 133
 Third, De Veau is most important for the insight it provides courts trying to "imaginatively summon the likely reaction of Congress" to allegedly preempted legislation. Justice Frankfurter's opinion notes that Congress approved the Waterfront Compact despite its awareness of the restrictions embodied in section 8 and despite the urging of counsel for the International Longshoremen's Association (the union most likely to be affected by section 8) that the compact's implementation would conflict with federal labor policy. See id. at 151, 80 S.Ct. at 1150 (citing Hearing on H.R. 6286, H.R. 6321, H.R. 6343, and S. 2383 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 83d Cong., 1st Sess. 136). Congress apparently perceived the problem of labor corruption on the waterfront to be of sufficient severity that state regulation would not be inimical to federal labor policy.
 
 
 134
 One could argue, of course, that the Waterfront Commission Compact constituted a specifically legislated exception to the NLRA manifesting congressional assent only to the state legislation there at issue. Such a characterization of De Veau and its facts, however, would be inconsistent with the compact's genesis. The Waterfront Commission Compact was presented to and considered by Congress not because its authors and sponsors believed it to embody a scheme that contravened the NLRA but because the Compact contemplated the establishment of a bi-state commission to combat evils that could not be eradicated by the two states acting individually. See H.R.Rep. No. 998, 83d Cong., 1st Sess. 3 (1953). In other words, it was the bi-state nature of the compact, and not any potential intrusion on national labor policy, that demanded congressional attention. Nothing in the Senate or House reports accompanying the compact suggests that Congress viewed its implementation as an exception to federal labor policy; rather, the Report of the House Judiciary Committee explicitly noted that "[t]he compact to which the committee here recommends that Congress grant its consent is in no sense antilabor legislation, but rather, antiracketeering legislation." Id. at 6.
 
 
 135
 I do not suggest that De Veau compels the conclusion that the NLRA does not preempt section 93 of the Casino Control Act; certainly the absence of a majority opinion there, and of a congressionally approved compact here, would undercut any such argument. At the same time, De Veau cannot be written off solely because it involved a compact, especially since the most plausible interpretation of its underlying scenario is that Congress did not view all state regulation of the qualifications of union officials as incompatible with the overall federal regulatory scheme.[14] The fact that the LMRDA does not preclude the states from enacting more stringent criteria than are embodied in section 504 supports that conclusion.
 
 
 136
 Because I conclude that section 7 does not necessarily preclude such state regulation, I therefore turn to the question whether New Jersey's regulation of unions associated with the casino industry is intended to effectuate the type of deeply rooted local interest contemplated by Local 926 v. Jones, supra.III. New Jersey's Interest
 
 
 137
 It is virtually beyond dispute that comprehensive regulation of casino gambling, including regulation of unions representing industry employees, is "important ... to [New Jersey] as a protection to its citizens."[15] Id. 103 S.Ct. at 1459. Gambling is an industry that is particularly susceptible to infiltration and control by organized crime and racketeers. See National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, The Development of the Law of Gambling: 1776-1976 (1977). Not only is this vulnerability documented by gambling's "checkered history in other jurisdictions," Staff Policy Group on Casino Gambling, Second Interim Report 2 (1977),[16] but the FBI has labelled gambling the "lifeblood of organized crime," Hearings Before the Commission on the Review of the National Policy Toward Gambling (May 10, 1976) (testimony of Frederick Fehl, Acting Assistant Director, FBI); see United States v. Garrison, 348 F.Supp. 1112, 1119 (E.D.La.1972). As the Superior Court of New Jersey remarked in a similar context, "[t]he undesirability of an association between those previously convicted of a crime or those in affinity with such a person and this sensitive 'business of racing and the legalized gambling attendant thereupon,' is too apparent to justify extended discussion." Niglio v. New Jersey Racing Commission, 158 N.J.Super. 182, 188, 385 A.2d 925, 928 (App.Div.1978).
 
 
 138
 Legalized casino gambling is particularly attractive to organized crime for two reasons:
 
 
 139
 First, a casino contains a vast amount of liquid assets in the form of cash and gaming chips which are very attractive and susceptible to misappropriation. Second, these liquid assets remain uncounted and unrecorded as the gaming activity takes place. Casinos are unique because millions of dollars are continually changing hands among thousands of people on the casino floor without any record being made of how much money is exchanged, how many people are involved, or who those individuals are.
 
 
 140
 Santaniello, Casino Gambling: The Elements of Effective Control, 6 Seton Hall Legis.J. 23, 23 (1982) (footnote omitted); see also New Jersey Commission of Investigation, Report and Recommendations on Casino Gambling, at III (1977) ("[T]he nature of the industry ... makes it a vulnerable target for criminal intrusion.").
 
 
 141
 Awareness of the attractiveness of casino gambling to racketeers and concern that the industry therefore could not remain "clean" contributed to the defeat in 1974 of a state-wide referendum to allow casino gambling in Atlantic City; a second referendum passed in 1976 only after proponents assured the public that New Jersey would have the "strongest regulations of casinos in the world," that organized crime would be prevented from infiltrating the industry, that operating controls would be stringent, and that only those individuals of the highest character, integrity, and competence would be permitted to participate in casino operations. See, e.g., Strongest Law in World Offered for Atlantic City Casinos, N.Y. Daily News, Oct. 1, 1976, at 40; Lawmakers Reveal Casino Guidelines, Newark Star Ledger, Oct. 1, 1976, at 1.[17]
 
 
 142
 Following the voters' approval of the referendum, the legislature held extensive hearings and, together with the Governor, commissioned reports on how best to insure that Atlantic City's casinos would remain clean. See Hotel and Restaurant Employees v. Danziger, supra, 536 F.Supp. at 322. These studies concluded that merely keeping organized crime from infiltrating the industry would be an insufficient goal; the success of the venture depend on gaining and retaining public trust in the industry's integrity. Thus the studies recommended legislation directed toward preventing even the appearance of impropriety. See Report and Recommendations, supra; Second Interim Report, supra. The reports also made clear that the achievement of those goals would require the regulation of every aspect of the industry, and not just the gaming operations.
 
 
 143
 Profitability is ... not a direct function of the quality of gaming or of the environment in and around the casino. Corporate corruption, cheating, loansharking, overextension of credit, insobriety, prostitution and a honky-tonk atmosphere are not antithetical to a desire for profit, and in the industry are occasionally viewed as legitimate societal overhead so long as they encourage, or at least do not interfere with, the vitality of the gambling market.
 
 
 144
 The interests of the State in the success of casino gambling are not coterminous with the interests of the entrepreneur. While the latter measures a net return on investment against the degree of risk, the State must measure social and economic benefits against offsetting social, economic and environmental costs. What is acceptable by one measure may be unacceptable by the other. The staff policy group has concluded that the uniqueness of the industry, taken with its potential societal consequences and its checkered history in other jurisdictions, compels a state regulatory interest in virtually every aspect of casinos and related operations.
 
 
 145
 Staff Policy Group, Second Interim Report, supra, at 1-2 (emphasis added).
 
 
 146
 The State Commission of Investigation (SCI), in formulating more specific recommendations, operated on the same premises and concluded that "only the most stringent of gambling control laws can thwart the infiltration of casinos and related services and suppliers by organized crime." Commission of Investigation, Report and Recommendations, supra, at II.[18] The SCI then made explicit that it was concerned not only with related services and suppliers but with labor unions as well. Labor unions, the SCI asserted, could offer organized crime an entree into the casino industry:
 
 
 147
 The S.C.I.'s experience and collected intelligence regarding organized crime strongly suggests that there are few better vehicles utilized by organized crime to gain a stranglehold on an entire industry than labor racketeering. Organized crime control of certain unions often requires the legitimate businessmen who employ the services of the union members to pay extra homage to the representatives of the underworld. Moreover the ready source of cash which union coffers provide can be employed as financing of all sorts of legitimate or illicit ventures.
 
 
 148
 Id. at 1-H.[19] The SCI therefore urged that unions representing employees of the casinos or their adjoining hotels be required to satisfy the same stringent qualification criteria required of casino operators. Id. at 1-H, 2-H.
 
 
 149
 Against this background, the New Jersey legislature enacted the Casino Control Act, including the provision challenged here. At the outset, the legislature displayed its awareness of the potential crime problems and their magnitude. The Act expressly declares its goals to include preventing criminal elements from gaining a foothold in the industry and avoiding any public perception that such a foothold even is available.[20]
 
 
 150
 The Act seeks to achieve these goals in two ways. First, the legislature created two separate agencies--the Casino Control Commission and the Division of Gaming Enforcement--to share responsibility for insuring the integrity of the casino industry; a system of checks and balances exists between the two agencies to keep the regulatory process itself above reproach.[21] Second, and more important for our purposes, the legislature accepted the recommendations of the SCI and the Governor's Staff Policy Group regarding the necessary breadth of control and granted the two agencies authority to regulate all aspects of the casino industry, including labor unions. As the Commission points out in its brief, the statutory and administrative controls over the casino gaming industry are "extraordinary pervasive and intensive." Knight v. City of Margate, 86 N.J. 374, 381, 431 A.2d 833, 836 (1981).
 
 
 151
 In sum, New Jersey's comprehensive regulation of the casino industry is a matter of intense and extraordinary local interest. Such regulation is not only essential to the State's struggle to maintain the integrity of the industry, but the very prospect of such comprehensive legislation was the basis upon which New Jersey's citizens consented to casino gambling in the first place. Given the unique nature of the industry--in particular its tremendous, unmonitored cash flow and its consequent attractiveness to racketeers and organized crime--the concerns of the legislature and citizenry cannot be characterized as anything less than "deeply rooted in local feeling and responsibility." Local 926 v. Jones, supra, 103 S.Ct. at 1459.
 
 IV. Preemption Doctrine Applied
 
 152
 As I noted at the outset, Local 926 v. Jones teaches that the NLRA does not necessarily preempt state legislation when the state's interest is as strong as New Jersey's is here. Rather, "[t]he question of whether regulation should be allowed ... involves a sensitive balancing of any harm to the regulatory scheme established by Congress ... and the importance of the asserted cause of action to the state as a protection to its citizens." Local 926 v. Jones, supra, 103 S.Ct. at 1459. It is indisputable that New Jersey's interest in comprehensive regulation of casino gambling is "deeply rooted in local feeling and responsibility," id. at 1458, and that the restrictions on persons who may be associated with the industry--in whatever capacity--are of manifest importance to the State "as a protection to its citizens," id. at 1459. And while I acknowledge that invocation of the sanctions provided by section 93 of the Casino Control Act may curtail the full exercise of section 7 rights, given the unique dangers posed by criminal infiltration of casino gambling, I cannot say that New Jersey's interest is outweighed by "any harm to the regulatory scheme established by Congress." Rather, Congress' acquiescence in the legislation at issue in De Veau suggests a congressional perception that, in situations where the threat to the welfare to the state is so pervasive and so well-documented that the need for comprehensive state regulation is manifest, such regulation will be permissible even if it includes a component that directly restricts section 7 rights.[22] I believe such situations to be rare, but I also believe that one is presented here.
 
 
 153
 Moreover, as the Court of Appeals for the Second Circuit has noted in discussing section 8 of the New York Waterfront Commission Act, the type of restrictions here at issue are a rather limited intrusion on section 7 rights. "The Act does not prohibit the election of these men to offices in [other] locals nor does it prohibit the collection of dues outside New York State from [other] longshoremen. It simply prevents corrupt union officials from contributing to a longstanding problem of criminal wrong-doing on the New York waterfront."[23] International Longshoremen's Association v. Waterfront Commission, 642 F.2d 666, 672 (2d Cir.), cert. denied, 454 U.S. 966, 102 S.Ct. 509, 70 L.Ed.2d 383 (1981).
 
 
 154
 Indeed the parallels between the New York Waterfront Commission Act and the Casino Control Act are striking. Like the New York Waterfront Commission Act, see De Veau, 363 U.S. at 147-51, 80 S.Ct. at 1148-1150, the Casino Control Act was passed only after extensive hearings, reports, and public outcry demanded the institution of stringent regulation to keep the industry clean. In both cases, the intent and effect of the state regulation was not directed particularly toward labor but, rather, toward the establishment of a comprehensive scheme in which union regulation was only one necessary component.[24] To be sure, the New York legislature enacted the Waterfront Commission Act only after the situation on the docks had already reached "appalling" proportions, see id. at 147, 80 S.Ct. at 1148, and New York's action therefore might be said to have been based on "harder" evidence of need than was New Jersey's. But to write into preemption jurisprudence a distinction between remedial and prophylactic legislation would prevent states from acting until an industry is so rife with corruption that "criminals, racketeers, and hoodlums [have] acquired a stranglehold," Hazelton v. Murray, 21 N.J. 115, 120, 121 A.2d 1, 4 (1956) (Brennan, J.) (describing condition of New York/New Jersey waterfront prior to compact and sustaining constitutionality of provision of New Jersey law identical to provision sustained in De Veau ). The inefficiency of such a distinction is manifest; to say that federal labor policy requires it would offend reason.
 
 
 155
 The majority rejects New Jersey's contention that gambling is unique and notes that other industries, such as solid-waste disposal, "have also been identified as susceptible of infiltration by organized crime." Majority op., at 830 (footnote omitted). Although it is true that other industries have been so identified, the majority's argument ignores the specifics of this situation and this industry. The casino industry is different: the huge number and the staggering aggregate amount of unrecorded cash transactions[25] make legalized gambling far more attractive to and ripe for criminal infiltration than are other industries. Moreover, New Jersey has adequately demonstrated through studies, hearings, and the experience of other jurisdictions, that these dangers can be avoided only by means of a comprehensive scheme that includes regulation of all aspects of the industry.[26] We are not dealing here with a display of anti-labor animus on the part of the New Jersey legislature; rather, we have before us a conscientious and well-reasoned attempt to erect a breakwater against a tide of vice and corruption that could engulf Atlantic City's casinos.
 
 
 156
 Finally, the mere fact that another state may attempt to regulate another industry in a way or to an extent that effectively would undermine the right of employees to choose their bargaining representatives does not mean that section 93 offends federal labor policy. The admitted difficulty of drawing lines does not allow us to abdicate our responsibility to do so. There are distinctions both between the provisions at issue here and the broad regulation of labor unions struck down in Hill, as well as between the pressing need to regulate this industry and the mere desire to do so in other areas. These distinctions are not merely theoretical; they are readily apparent and enormously important.
 
 
 157
 In sum, given the magnitude of New Jersey's interest in comprehensively regulating of the casino industry, and my conclusion that such regulation does not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (footnote omitted), I would hold that the NLRA does not preempt section 93 of the Casino Control Act.
 
 
 
 [1]
 The district court opinion is reported. Hotel and Restaurant Employees and Bartenders International Union Local v. Danzinger (sic), 536 F.Supp. 317 (D.N.J.1982)
 
 
 [2]
 The court found:
 The facts essential to the determination of the motion are as follows:
 
 
 [1]
 Plaintiff Hotel and Restaurant Employees and Bartenders International Union Local 54 is an unincorporated labor organization within the meaning of Sec. 2(5) of the National Labor Relations Act, as amended, infra, representing, inter alia, about 8,000 licensed employees of the casinos and casino hotels in Atlantic City, New Jersey, in collective bargaining and other matters affecting employer-employee relations. Plaintiff Frank Gerace is president of Local 54
 
 
 [2]
 Frank Gerace is a trustee of the Hotel Employees and Restaurant Employees and Bartenders International Union Pension Fund, as well as the Hotel Employees and Restaurant Employees and Bartenders International Union Health & Welfare Fund. Local 54, through its officers, participates in the operation of these funds, both of which are employee benefit plans within the meaning of the Employee Retirement Income Security Act of 1974, infra. (Plaintiffs' Exhibit 5)
 
 
 [3]
 Local 54 filed its annual registration statement as required by the Casino Control Act in 1978. On May 12, 1981, the defendant Division of Gaming Enforcement, following its investigation of the applicant, stated its objections to the application. (Plaintiffs' Exhibit 2)
 
 
 [4]
 The Casino Control Commission thereupon ordered that hearings on the subject of Local 54's registration commence on September 9, 1981. (Affidavit of Frank Gerace, August 17, 1981, p 2; Defendants' Exhibit 3)
 
 
 [5]
 Local 54 has posed to the Casino Control Commission certain of its objections to the registration requirement, the conduct of its officers being the subject of a hearing, and to the possibility that the sanctions of Sec. 93 of the Casino Control Act may be imposed. (Plaintiffs' Exhibit 4). The Commission has held that it is without jurisdiction to reach the constitutional objections to Sec. 93. (Plaintiffs' Exhibit 4)
 
 
 [6]
 The Casino Control Commission has adjourned the hearing scheduled for September 9, 1981, pending determination of the instant motion for preliminary relief. (Defendants' Exhibit 3)
 
 
 [536]
 F.Supp. at 324
 
 
 [3]
 "The commission may for the purpose of this subsection waive any disqualification criterion consistent with the public policy of this act and upon a finding that the interests of justice so require." N.J.Stat.Ann. 5:12-93(b) (West Supp.1982)
 
 
 [4]
 The October 12, 1982 order obviously was not called to the district court's attention in connection with the Rule 60(b) motion, but it is a matter of public record which the parties called to our attention and of which we can properly take judicial notice
 
 
 [5]
 See Justice Bodine's discussion of the early common law in Dombrowski v. State, 111 N.J.L. 546, 168 A. 722 (S.Ct.1933). Note, The Casino Act: Gambling's Past and the Casino Act's Future, 10 Rut.-Cam.L.J. 279 (1979)
 
 
 [6]
 Robert L. Hale, Professor of Law, Columbia University, in hearings on the NLRA explained that although Adair was not explicitly overruled by Texas & New Orleans Railroad Co., that was the practical effect of the decision. To Create a National Labor Board, Hearings on S. 2926 Before The Senate Committee on Education and Labor, 73d Cong., 2d Sess. 52 (1934) (statement of Robert L. Hale, Professor of Law, Columbia University)
 
 
 [7]
 Hearings on S. 2926 Before the Senate Committee on Education and Labor, 73d Cong., 2d Sess. 606-07, 645-46, 745-52, 979 (1934) (statements of William B. Donham, Dean, Harvard Business College; Howard Goodman, Manager, Goodman Manufacturing Co.; Charles R. Hook, Pres., American Rolling Mill, Co.; William F. Dunne, Member, National Committee of the Trade Union Unity League)
 
 
 [8]
 Sec. 504. Prohibition against certain persons holding office
 (a) Membership in Communist Party; persons convicted of robbery, bribery, etc.
 No person who is or has been a member of the Communist Party or who has been convicted of, or served any part of a prison term resulting from his conviction of, robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, assault which inflicts grievous bodily injury, or a violation of subchapter III or IV of this chapter, or conspiracy to commit any such crimes, shall serve--
 (1) as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, or other employee (other than as an employee performing exclusively clerical or custodial duties) of any labor organization, or
 (2) as a labor relations consultant to a person engaged in an industry or activity affecting commerce, or as an officer, director, agent or employee (other than as an employee performing exclusively clerical or custodial duties) of any group or association of employers dealing with any labor organization,
 during or for five years after the termination of his membership in the Communist Party, or for five years after such conviction or after the end of such imprisonment, unless prior to the end of such five-year period, in the case of a person so convicted or imprisoned, (A) his citizenship rights, having been revoked as a result of such conviction, have been fully restored, or (B) the Board of Parole of the United States Department of Justice determines that such person's service in any capacity referred to in clause (a) or (2) would not be contrary to the purposes of this chapter. Prior to making any such determination the Board shall hold an administrative hearing and shall give notice of such proceeding by certified mail to the State, county, and Federal prosecuting officials in the jurisdiction or jurisdictions in which such person was convicted. The Board's determination in any such proceeding shall be final. No labor organization or officer thereof shall knowingly permit any person to assume or hold any office or paid position in violation of this subsection.
 (b) Penalty for violations
 Any person who willfully violates this section shall be fined not more than $10,000 or imprisoned for not more than one year, or both.
 29 U.S.C. Sec. 504 (1976).
 
 
 [9]
 LaSane's extortion conviction would be disqualifying under 29 U.S.C. Sec. 504(a) had it occurred within five years. His 1973 conviction falls well outside the time fixed in the federal law
 
 
 [10]
 The New Jersey solid waste industry has frequently been so identified
 
 
 [11]
 Cf. Amalgamated Clothing Workers v. Richman Bros., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600 (1955) (28 U.S.C. Sec. 2283 prevents injunction against state court proceeding in action by Union rather than Board)
 
 
 [1]
 By reaching the merits of this appeal, the majority assumes that we are presented with a live controversy. I have evinced my agreement with that conclusion by joining the majority's holding that ERISA preempts some of the Casino Control Act's sanctions. I nonetheless find the question sufficiently troublesome that it warrants some discussion
 This is an appeal from a district court order denying appellants' motion for a preliminary injunction. Unlike the complaint, however, the focus of that motion was the holding of hearings that have now taken place: the motion principally alleged that the "proceedings [i.e., the Casino Control Commission's hearings and investigations] present an immediate and irreparable injury" to appellants' section 7 rights. Motion for Preliminary Injunction p 5 (emphasis added). The district court denied the motion on the basis that appellants could not demonstrate that the proceedings would result in the requisite irreparable harm: "The inquiry into the qualifications of the union and its leaders may not be considered to visit irreparable harm on the plaintiffs; something further must befall them before preemption may be found." Hotel and Restaurant Employees and Bartenders Int'l Union Local 54 v. Danzinger [sic], 536 F.Supp. 317, 330 (D.N.J.1982). As the supplemental record now reveals, and as the majority now acknowledges, the proceedings that the district court refused to enjoin have been completed. It thus might appear that this appeal should be dismissed as moot.
 Such a disposition, however, would be severe, as all that stands between appellants and enforcement of the Commission's order that Local 54 rid itself of certain officers or be barred from collecting dues from its members is the district court's stay of that order pending the disposition of this appeal. Although I do not think that this unfortunate circumstance is itself sufficient to resurrect what otherwise would be a moot appeal, I do believe that the same considerations which persuaded the district court to grant the stay also suggest that this case is one of a rare breed in which it is appropriate for us to reach the merits, notwithstanding the interlocutory posture of the appeal. As Judge Friendly wrote for the Court of Appeals for the Second Circuit in a similar context:
 [A]n appellate court has the power, on review of a denial of a temporary injunction, to consider the case on the merits and decide whether the complaint states a claim on which relief can be granted.... Although in most of the cases where this course has been followed the appellate court has ordered the complaint to be dismissed, such a procedure is also appropriate in the converse situation at least where, as here, no material facts are contested, the lower court has considered the merits in detail, and these have also been argued here.... To "save the parties from further litigation" we should therefore "proceed to consider and decide the case upon its merits," [Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 494, 20 S.Ct. 708, 712, 44 L.Ed. 856 (1900) ], unless a ruling on the entire complaint, with its requests for declaratory and permanent injunctive ... relief, has also become moot.
 Montano v. Lefkowitz, 575 F.2d 378, 382 (2d Cir.1978) (citations omitted). This case, too, is amenable to such treatment, despite the fact that the district court did not reach the viability of the Casino Control Act's ultimate sanctions. There are no disputed issues of material fact; the parties have extensively and comprehensively briefed and argued the merits both before the district court and this Court; and the preemption issue, essentially a question of law, is one as to which we ultimately would have plenary review. Because appellants' requests for permanent injunctive and declaratory relief are still very much alive, I therefore agree with the majority's decision to reach the merits of this appeal.
 
 
 [2]
 Despite its acknowledgment that Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir.1982) (in banc), recognizes a limited class of pendent appeals under 28 U.S.C. Sec. 1292(a)(1) (1976), the majority posits three reasons why we do not have jurisdiction over the cross-appeals. None of these considerations, however, poses an insurmountable obstacle to our taking jurisdiction
 First, the majority offers no support for its assertion that the Casino Control Commission and the Division of Gaming Enforcement may not raise their cross-appeals here because they were not aggrieved by the denial of the preliminary injunction. Moreover, that proposition is inconsistent with the fact that courts of appeals reviewing denials of preliminary relief frequently dismiss cases for failure to state a cause of action, thereby acting as if they had granted a cross-motion to dismiss. See Montano v. Lefkowitz, 575 F.2d 378, 382 (2d Cir.1978) (quoted supra note 1).
 Second, the majority is too willing to dismiss the cross-appeals on the ground that the district court (apparently inadvertently) neglected to enter an order denying the motions to dismiss or abstain. The majority states: "The trial court's opinion discussed these motions, but appeals do not ordinarily lie from opinions." Majority op., at 821 (emphasis added). But this formulation, by its own terms, admits of an exception, and it is one that we previously have recognized. Where, as here, a district court opinion necessarily and definitively resolves a question as a predicate for its holding, the district court's resolution is reviewable on appeal. See United States ex rel. Fielding v. Degnan, 587 F.2d 619, 621 (3d Cir.1978). Here the district court could not have reached the merits of appellants' motion for preliminary relief without first having denied appellees' motion to abstain.
 Finally, the majority incorrectly asserts that a cross-appeal from a denial of a motion to abstain does not satisfy Kershner v. Mazurkiewicz's test for pendent interlocutory cross-appeals. Kershner, which did not permit the cross-appeal of a class certification order, stated that the issue on cross-appeal must be "inextricably bound" with or controlling of the disposition of the preliminary injunction issue. 670 F.2d at 449. Since injunctive relief should not be granted if abstention is required, it seems quite clear that the propriety of abstention is inextricably bound with the review of a decision to grant or to deny preliminary injunctive relief.
 
 
 [3]
 Although the Supreme Court initially promulgated the Younger abstention doctrine in order to prevent federal courts from interfering with ongoing state criminal proceedings, see Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Court has since broadened the doctrine's scope. Federal courts now are admonished to refrain from taking action, absent extraordinary circumstances, when a plaintiff requests relief that would impinge on state proceedings of virtually any variety. "The policies underlying Younger are fully applicable to noncriminal judicial proceedings when important state interests are involved." Middlesex County Ethics Comm. v. Garden State Bar Ass'n, --- U.S. ----, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (holding that federal court should have abstained from interfering with ongoing state-bar disciplinary proceedings)
 Thus, at first blush, this case appears to fall within the class of cases in which district courts should abstain from adjudicating the claims at issue. Proceedings to enforce the Act's prohibitions are essential to vindicating the state's policies, see infra Part III; New Jersey's interest surely is as strong as, if not stronger than, those that have been deemed sufficient in other cases. Cf. Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (barring interference with state proceeding to recover welfare money); Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (barring injunction against state civil contempt proceedings); Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (barring injunction against civil enforcement action to close down theater showing obscene movies); Williams v. Red Bank Bd. of Educ., 662 F.2d 1008 (3d Cir.1981) (barring interference with tenure-revocation proceeding).
 This conclusion is not altered by the fact that the proceedings, unlike those in Middlesex County, are not conducted under the auspices of the judiciary. In Williams v. Red Bank Bd. of Educ., supra, this Court addressed the question whether the federal courts should entertain a challenge to ongoing tenure-revocation proceedings. Noting that "[a]dministrative regulation often forms a crucial aspect of a state's implementation of its laws ...," we held that "where federal intervention into state administrative proceedings would be substantial and disruptive, and where the state proceedings are adequate to vindicate federal claims and reflect strong and compelling state interests, the district court, pursuant to Younger, should abstain." 662 F.2d at 1016, 1017.
 While the administrative nature of the Casino Control Act's proceedings therefore do not themselves remove this case from the ambit of Younger abstention, I do not believe that the proceedings afford an adequate opportunity for the vindication of appellants' federal claims. See Middlesex County, supra, 102 S.Ct. at 2521. To be sure, as in Red Bank, any decision of the Casino Control Commission is appealable to the state courts, and Younger's premise is that state courts are as competent as are federal courts to adjudicate federal claims. Here, however, appellants attack not merely the sanctions for which the Casino Act provides; appellants also assert that their federally created rights are violated by appellants' being subjected to the administrative proceedings themselves. Thus, regardless of the competence of the state judiciary, all of appellants' federal claims simply cannot be vindicated in state court.
 In such circumstances, abstention is inappropriate because it would deprive a putative plaintiff of the opportunity to vindicate his federal claims. I therefore would hold that, where an individual who is subject to state proceedings to which the federal courts otherwise would defer raises a colorable claim that the proceedings themselves constitute a violation of a constitutional or statutory right, the principles of comity and federalism motivating Younger are superseded. Cf. Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (denial of claim of double jeopardy is an appealable collateral order); United States ex rel. Webb v. Court of Common Pleas, 516 F.2d 1034, 1037 (3d Cir.1975) (pre-trial habeas relief available where alleged nature of constitutional right asserted, i.e., not to be tried twice, makes post-conviction relief incapable of vindicating the right); Jackson v. Justices, 549 F.2d 215, 220 n. 1 (1st Cir.) (Coffin, C.J., dissenting) ("Whether or not there is to be a general 'futility' exception to the Younger doctrine, an exception seems appropriate in the case of double jeopardy claimants who are to be denied the opportunity in the state court system to demonstrate that they have a right not to be retried."), cert. denied, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 370 (1977).
 
 
 [4]
 Thus the majority is incorrect to the extent that it admonishes against "engaging in weighing or balancing," Majority op., at 828
 
 
 [5]
 Ordinarily, of course, the language and legislative history of the statute itself provide the starting point for inquiries into congressional intent. In this case, however, contrary to the intimations of the majority, neither the NLRA nor the Taft-Hartley Act is of much assistance in that regard
 
 
 [1]
 The National Labor Relations Act of 1935 (The Wagner Act)
 In the course of congressional debate over the Wagner Act, Pub.L. No. 74-198, 49 Stat. 449 (1935), the only real mention of the relationship between federal and state regulation of the selection of bargaining representatives was an objection that the Act's regulation of local employment would violate the tenth amendment. See Letter from Counsel for Appellant to the Court (Dec. 3, 1982) (submitted at the request of the Court) (citing Hearings on S. 1958 at 243-44, 840 (Mar. 11-14, 1935) (statement of James A. Emery)). The ultimate rejection of that position, however, in no way implies that Congress intended to preempt the field. Indeed as the majority eloquently demonstrates, subsequent case law implies the contrary. The majority, however, infers a preemptive intent from the fact that Congress did not impose eligibility requirements for service as collective bargaining representatives despite having had drawn to its attention related problems of labor racketeering. Though the omission no doubt represented, as the majority asserts, "a conscious legislative choice," it would be equally plausible to infer that Congress preferred any such restrictions to be imposed by the states. Thus the omission of restrictions provides little insight into congressional intent.
 
 
 [2]
 Labor Management Relations Act of 1947 (Taft-Hartley)
 Resort to the legislative history of the Taft-Hartley Act, Pub.L. No. 80-101, 61 Stat. 136 (1947), is equally unilluminating. These debates, too, contain no discussion of the extent to which Congress wished to preclude imposition by the states of qualifications for union representatives. See Garner v. Teamsters, Chauffers, and Helpers Local Union No. 776, 346 U.S. 485, 488, 74 S.Ct. 161, 164, 98 L.Ed. 228 (1953) ("The [LMRA] ... leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible."). Indeed only a few of Taft-Hartley's provisions refer to state action, and those provisions can support conflicting inferences. Two provisions arguably support an inference that Congress intended to preempt unless it stated otherwise. First, Congress amended Sec. 10(a), 29 U.S.C. Sec. 160(a) (1976), to eliminate the NLRB's exclusive jurisdiction, and instead to allow the NLRB, with certain restrictions, to cede jurisdiction to state agencies. Second, Sec. 14(b), id. Sec. 164(b), explicitly permits the states to prohibit union security clauses. The House Committee explained that "[i]t was never the intention of the [NLRA], as is disclosed by the legislative history of that act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism." H.R.Rep. No. 510, 80th Cong., 1st Sess., reprinted in 1947 U.S.Code Cong. & Ad.News 1135, 1166.
 But if Secs. 10(a) and 14(b) might be read to imply that state action is precluded unless specifically permitted, Sec. 14(a), 29 U.S.C. Sec. 164(a) (1976), leaves the contrary impression. That section states:
 Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.
 The fact that Congress felt the need explicitly to preclude states from defining supervisors as employees for purposes of collective bargaining might be read to suggest that the states do retain some freedom to enact other proscriptions not mentioned by the NLRA. The question whether Sec. 14(a) should be so interpreted is not presented here, and I do not necessarily advocate such a reading. I posit the argument only to underscore that we should be wary of inferring preemptive intent from provisions that do not expressly license the states to act.
 In short, despite the fact that the Taft-Hartley Congress was clearly attuned to the problems associated with dual systems of regulation, there was no discussion of the preemptive effect of Sec. 7. The legislative history of Taft-Hartley is thus of little more help than is that of the Wagner Act.
 
 
 [6]
 There is another reason that Hill does not control all aspects of this case. The Hill Court made relatively clear with respect to section 4, and explicitly so with respect to section 6, that it was the statutes' sanctions that conflicted with congressional purpose. In particular, the Court noted in discussing section 6:
 The requirement as to the filing of information and the payment of a $1.00 annual fee does not, in and of itself, conflict with the Federal Act. But, for failure to comply, this union has been enjoined from functioning as a labor union. It could not without violating the injunction and also subjecting itself to the possibility of criminal punishment even attempt to bargain to settle a controversy or a strike. It is the sanction here imposed, and not the duty to report, which brings about a situation inconsistent with the federally protected process of collective bargaining.
 325 U.S. at 543, 65 S.Ct. at 1375 (emphasis added). Thus even if Hill were controlling here, this formulation suggests only that a state may not prevent a union collecting dues from its members. But this case involves more than just the Casino Control Commission's ultimate sanction power. Also at issue are the Casino Act's provisions for registration and licensing of unions representing casino employees, for investigations by the Division of Gaming Enforcement, and for hearings by the Commission. By failing to distinguish these various elements of the Casino Act's scheme from the sanctions, the majority intimates that Hill would preclude them as well. Indeed the majority characterizes the hearings as an "illegal proceeding," Majority op., at 831, without any discussion to that effect. But given the Supreme Court's holding that it was the "sanction [t]here imposed, and not the duty to report," that conflicted with the NLRA, Hill simply cannot be construed as affecting the validity of the non-sanction provisions; to the extent that the majority holds the contrary, I dissent from that part of the holding as well. See also Alabama State Fed'n of Labor v. McAdory, 325 U.S. 450, 466, 65 S.Ct. 1384, 1392, 89 L.Ed. 1725 (1945) ("Nor can we say in the absence of any showing to the contrary that the filing of information returns will impose such burdens on any of petitioners as to interfere with the performance of their functions under the [NLRA]....").
 
 
 [7]
 The full text of Sec. 504 is set forth at note 8 of the majority's opinion
 
 
 [8]
 The other savings clause is contained in Sec. 604, which explicitly preserves the ability of the states to enact "garden variety criminal laws," see Majority op., at 828, notwithstanding the LMRDA's "federalization" of conduct that might otherwise come within the scope of state criminal law
 Nothing in this chapter shall be construed to impair or diminish the authority of any State to enact and enforce general criminal laws with respect to robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, or assault which inflicts grievous bodily injury, or conspiracy to commit any of such crimes.
 29 U.S.C. Sec. 524 (1976). This provision, the majority notes, was enacted in response to dicta in Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), and San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), that states might be precluded from regulating conduct proscribed by federal law. Although this savings clause does not authorize the type of restriction here at issue, I do not agree, for the reasons stated in text, that Congress' decision to include the clause in the LMRDA suggests that other sections without similar clauses must be read as preemptive.
 
 
 [9]
 For the facts of De Veau, see infra Part II.C
 
 
 [10]
 I note in passing that appellants here contend that only the NLRA and ERISA preempt the sanctions provided by the Casino Control Act. They have apparently abandoned the argument they advanced to the district court that the LMRDA also has such a preemptive effect. The district court rejected that argument, noting that the contention was "easily disposed of by reference to DeVeau." Hotel and Restaurant Employees v. Danziger, supra, 536 F.Supp. at 327; see id. at 326-28
 
 
 [11]
 Unlike Sec. 504 of the LMRDA, which bars convicted felons from holding union office for five years, Sec. 8 of the New York Waterfront Commission Act imposes a bar that may be permanent:
 No person shall solicit, collect or receive any dues, assessments, levies, fines or contributions, or other charges within the state for or on behalf of any labor organization which represents employees registered or licensed pursuant to the provisions of this act ... if any officer, agent or employee of such labor organization ... has been convicted by a court of the United States, or any state or territory thereof, of a felony [or] any misdemeanor involving moral turpitude ... unless he has been subsequently pardoned therefor by the governor or other appropriate authority of the state or jurisdiction in which such conviction was had or has received a certificate of good conduct from the board of parole pursuant to the provisions of the executive law to remove the disability.
 N.Y.Unconsol.Laws Sec. 9933 (McKinney 1974). In fact, New York was seeking to bar De Veau from holding union office because of a 36-year old conviction for which De Veau had received a suspended sentence.
 
 
 [12]
 Although section 8 was not itself part of the compact, it had been enacted prior to submission of the compact and was intended to be part of its comprehensive scheme
 In light of the purpose, scope and background of this New York legislation and Congress' relation to it, ... an inference of incompatibility has no foundation.... Here the States presented their legislative program to cope with an urgent local program to the Congress, and the Congress unambiguously supported what is at the core of this reform. Had Sec. 8 been written into the compact, even the most subtle casuistry could not conjure up a claim of pre-emption.
 De Veau, 363 U.S. at 153, 80 S.Ct. at 1151. Section 8 itself did not contemplate or require bi-state enforcement. Id. New Jersey, however, enacted a virtually identical provision. See N.J.Stat.Ann. Sec. 32:23-80 (West 1963).
 
 
 [13]
 See also Local 1804, Internat'l Longshoremen's Ass'n v. Waterfront Comm'n, 85 N.J. 606, 613, 428 A.2d 1283, 1287 (1981):
 The leading case of De Veau v. Braisted ... suggests three criteria for determining whether a federal law preempts section 8. The criteria are: (1) the extent to which the matter regulated involves matters of local responsibility or concern; (2) the degree to which the state law interferes with federal law; and (3) the amount of interference Congress was willing to tolerate.
 
 
 [14]
 The majority limits its discussion of De Veau solely to rebutting the notion that De Veau overruled Hill. The majority concludes quite correctly that it did not; indeed appellees have not argued otherwise, contrary to the majority's assertion. But having established that Hill has not been overruled, the majority cursorily concludes that "De Veau ... cannot, therefore, be read as impairing the authority of Hill v. Florida." Majority op., at 829
 This off-hand dismissal is too hasty. First, to the extent that the majority predicates its conclusion on De Veau's failure to overrule Hill, it is important to keep in mind that the Supreme Court continually modifies prior holdings without overruling them. See, e.g., EEOC v. Wyoming, --- U.S. ----, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (limiting, without overruling, National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)). Indeed Justice Frankfurter's opinion in De Veau expressly distinguished Hill, and not solely on the basis of the compact: "Nor was it true of Hill v. Florida, as it is here, that the challenged state legislation was part of a program, fully canvassed by Congress through its own investigations, to vindicate a legitimate and compelling state interest, namely, the interest in combatting local crime infesting a particular industry." 363 U.S. at 155, 80 S.Ct. at 1152.
 Second, the majority's analysis ignores De Veau's refusal blindly to apply Hill's prohibition against state imposition of dues-collecting sanctions. Indeed the fact that Congress acquiesced in the type of state-imposed sanctions struck down in Hill further undercuts the majority's reliance on congressional failure explicitly to overrule Hill.
 
 
 [15]
 Casino gambling traditionally has been considered to be within the purview of the states to regulate, and one court even has suggested that "gaming is a matter reserved to the states within the meaning of the Tenth Amendment ... [leaving] no room for federally protected constitutional rights," State v. Rosenthal, 93 Nev. 36, 44, 559 P.2d 830, 836, appeal dismissed, 434 U.S. 803, 98 S.Ct. 32, 54 L.Ed.2d 61 (1977). Gambling does affect interstate commerce, however, and Congress has enacted a number of laws regulating the interstate aspects of gambling, see, e.g., 15 U.S.C. Secs. 1171-1178 (1976) (barring interstate shipment of gambling devices); 18 U.S.C. Secs. 1082-1083 (1976) (prohibiting gambling on certain ships); id. Sec. 1084 (1976) (barring transmission of wagering information over interstate wires); id. Secs. 1301-1307 (1976 & Supp. V 1981) (regulating lotteries); id. Sec. 1953 (1976 & Supp. V 1981) (barring interstate shipment of gambling paraphernalia)
 
 
 [16]
 See also Marshall v. Sawyer, 301 F.2d 639, 648-50 (9th Cir.1962) (Pope, J., concurring) (discussing the known hazards of gambling that led to strict controls in Nevada ); Nevada Tax Comm'n v. Hicks, 73 Nev. 115, 119, 310 P.2d 852, 854 (1957) ("Throughout this country, ... gambling has necessarily surrounded itself with an aura of crime and corruption.")
 
 
 [17]
 Cf. Knight v. City of Margate, 86 N.J. 374, 392, 431 A.2d 833, 842 (1981) ("Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the [state] Constitution itself.")
 
 
 [18]
 The SCI went into more detail in formulating its specific recommendations:
 Although the State Commission of Investigation and segments of law enforcement have been highly successful in removing many identified members of organized crime from New Jersey society, there remains a well-organized highly functional organized crime network in this state. Additionally, it is important to note that the appearance of organized crime is presently changing. As traditional sources of illegal funds become more limited and more easily detected and prosecuted, elements of organized crime have become significantly more interested in investing funds in legitimate enterprises.
 The infiltration of legitimate business by organized crime is a situation which society should be aggressive to prevent. In addition to providing a ready source of funds to capitalize illegal ventures, a convenient cash flow to disguise illegal profits, and an ostensibly legitimate occupation for organized crime members and associates, an incursion into legitimate enterprise is often accompanied by extortion, loansharking, commercial bribery, tax violations and anti-trust law infringements.
 Thus, it is the position of the S.C.I. that any casino gambling legislation should not only preserve and protect the integrity of the operation of casinos in Atlantic City, but should also foreclose the possibility of opening up new and fertile areas of legitimate business enterprise to elements of organized crime.
 The S.C.I.'s continuing organized crime program discloses that there are several identifiable legitimate enterprises which have long been a target of infiltration by organied [sic] crime. Further, the S.C.I.'s monitoring of the workings of organized crime in Atlantic City discloses substantial movement by organied [sic] crime in contemplation of a casino operation and the potential which it represents. The general approach which the S.C.I. deems advisable is the exposure to stringent licensing scrutiny by the gambling regulatory body of all industries of concern and particularly more of an ancillary nature.
 The most efficacious legislative scheme must strike the proper balance between the magnitude of the State's interest in licensing certain service industries and the required administrative resources which will be necessitated. It would be overly burdensome to require licensure for all parties entering into a contractual relationship with the licensed hotel yet, as has been stated, it would be against the interests of the state not to require licensure [in] most other cases. The required scrutiny of the proposed provider should be directly proportional to the risk to the gaming industry and society as a whole. The risk is twofold: (a) that undesirable elements infiltrate the gaming industry through direct involvement with the casino operation, and (b) that undesirable elements either indirectly affect the gaming industry through involvement with the hotel or are financially benefitted through profits recouped from endeavors relating to casino gaming.
 Id. at 1-C to 2-C (emphasis in original).
 
 
 [19]
 New Jersey's Attorney General recently expressed a similar view when testifying before the Senate Permanent Subcommittee on Investigations:
 Organized labor is in a prime position to exert tremendous pressure over the casino industry .... What would a casino owner pay for labor peace? How much is it worth to keep a business that grosses between $500,000 and $1 million a day free of a strike? A corrupt union could extort outright payments or use its power of persuasion to dictate what firms get the lucrative ancillary service contracts within the casino industry.
 Quoted in Court Delay Seen in Casino Dispute, N.Y. Times, Oct. 10, 1982, at 55, col. 1.
 
 
 [20]
 The Act enumerates seventeen policy declarations and findings of fact, four of which are relevant here:
 (6) An integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations. To further such public confidence and trust, the regulatory provisions of this act are designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises and all related service industries as herein provided. In addition, licensure of a limited number of casino establishments, with the comprehensive law-enforcement supervision attendant thereto, is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process.
 (7) Legalized casino gaming in New Jersey can attain, maintain and retain integrity, public confidence and trust, and remain compatible with the general public interest only under such a system of control and regulation as insures, so far as practicable, the exclusion from participation therein of persons with known criminal records, habits or associations, and the exclusion or removal from any positions of authority or responsibility within casino gaming operations and establishments of any persons known to be so deficient in business probity, ability or experience, either generally or with specific reference to gaming, as to create or enhance the dangers of unsound, unfair or illegal practices, methods and activities in the conduct of gaming or the carrying on of the business and financial arrangements incident thereto.
 ....
 (9) Since casino operations are especially sensitive and in need of public control and supervision, and since it is vital to the interests of the State to prevent entry, directly or indirectly, into such operations or the ancillary industries regulated by this act of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of this State, the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid entry of such persons into the casino operations or the ancillary industries regulated by this act.
 ....
 (15) Continuity and stability in casino gaming operations cannot be achieved at the risk of permitting persons with unacceptable backgrounds and records of behavior to control casino gaming operations contrary to the vital law enforcement interest of the State.
 N.J.Stat.Ann. Sec. 5:12-1 (West Supp.1982).
 
 
 [21]
 For a comprehensive discussion of this regulatory process, including the mechanisms designed to guarantee its integrity, see Cohen, The New Jersey Casino Control Act: Creation of a Regulatory System, 6 Seton Hall Legis.J. 1 (1982)
 
 
 [22]
 I read Local 926 as consistent with this view
 
 
 [23]
 See also Hazelton v. Murray, 21 N.J. 115, 123, 121 A.2d 1, 5-6 (1956) (Brennan, J.) (sustaining Sec. 8 of New Jersey's Waterfront Commission Act) ("If the conviction of crime is a proper consideration related to the public interest for the purposes of licensing and registering waterfront workers, much more so is the provision here under review which would wrest from the vicious criminal combine the means through which the corrupt conspiracy was perpetrated.")
 
 
 [24]
 Like the Casino Control Act, the legislation to clean up the New York Waterfront did not merely regulate union officials:
 [The Commission has the] power to license, register and regulate the waterfront employment of pier superintendents, hiring agents, longshoremen and port watchmen, and to license and regulate stevedores. [The compact] entirely prohibits one class of waterfront employment, public loading, found to be unnecessary and particularly infested with corruption.... The issue of licenses to engage in waterfront occupations, or the right to be registered, depends upon findings by the Commission of good character. In particular, past convictions for certain felonies constitute specific disabilities for each occupation, with discretion in the Commission to lift the disability, except in the case of port watchmen, where it constitutes an absolute bar to waterfront employment. A new procedure for the employment of longshoremen is also provided under the supervision of the Commission, replacing the archaic, corrupt 'shape-up.'
 De Veau, 363 U.S. at 149, 80 S.Ct. at 1149.
 
 
 [25]
 The "handle," i.e., the total amount of money bet, in Atlantic City's casinos was more than $5 billion in 1982
 
 
 [26]
 The majority accurately notes that the NLRB has consistently asserted jurisdiction over the casino industry; indeed I do not contend that the NLRB should not do so here. But the majority implies that the exercise of the NLRB's jurisdiction cannot be reconciled with state regulation such as section 93 and that section 93 must therefore be deemed incompatible with the NLRA's regulatory framework. This implication is incorrect, for the NLRB continues to exercise jurisdiction over the New York waterfront, despite the vitality of the restriction upheld in De Veau
 In addition, I note that the NLRB, in declining jurisdiction over labor disputes in the dog-racing and horse-racing industries, has suggested that state regulation of labor, when it is part of a pervasive industry-wide scheme, is not necessarily inconsistent with national labor policy:
 In prior decisions, the Board declined to assert jurisdiction over these industries noting, inter alia, the extensive State control over the industries. It appears that State law sets racing dates of the tracks; State law determines the percentage share of the gross wagers that goes to the State; and State law determines the percentage of gross wagers to be retained by the track. In addition, the State licenses employees, exercises close supervision over the industries through State racing commissions, and in many States retains the right to effect the discharge of employees whose conduct jeopardizes the "integrity" of the industry. As the industries constitute a substantial source of revenue to the States, a unique and special relationship has developed between the States and these industries which is reflected by the States' continuing interest in and supervision over the industries.
 Declination of Assertion of Jurisdiction, 38 Fed.Reg. 9537 (1973) (codified at 29 C.F.R. Sec. 103.3 (1982)). Although a district court held that the rule violates the NLRB's statutory mandate, see New York Racing Ass'n v. NLRB, 110 L.R.R.M. 3177 (E.D.N.Y.1982) (NLRB may decline jurisdiction only over industries not substantially affecting interstate commerce), that decision was recently vacated, 708 F.2d 46 Nos. 82-6252, 6258 (2d Cir. May 10, 1983) (district court does not have jurisdiction to review such NLRB rules).